UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

KENNIA Y. GARCES,

                              Plaintiff,

          -against-

COMMISSIONER OF SOCIAL SECURITY,[1]

                              Defendant.

---

19cv10732 (DF)

**MEMORANDUM
AND ORDER**

**DEBRA FREEMAN, United States Magistrate Judge:**

In this Social Security action, which is before this Court on consent pursuant to 28 U.S.C.

§ 636(c), *pro se* plaintiff Kennia Y. Garces ("Plaintiff") seeks review of the final decision of

defendant Commissioner of the Social Security Administration ("SSA") ("Defendant" or the

"Commissioner), denying Plaintiff Social Security Disability Insurance ("SSDI") under the

Social Security Act (the "Act") on the grounds that, for the relevant period, Plaintiff's

impairments did not render her disabled under the Act.  Currently before the Court is

Defendant's motion for judgment on the pleadings affirming the Commissioner's decision and

dismissing the Complaint.  (Dkt. 23.)  For the reasons set forth below, Defendant's motion is

denied, and Plaintiff's opposition, which the Court construes as a cross-motion for judgment on

the pleadings in her favor, is granted to the extent that this matter shall be remanded to the SSA

for further proceedings.

---

[1] The Court notes that Andrew M. Saul has been appointed Commissioner of the Social
Security Administration ("SSA").

## BACKGROUND[2]

Plaintiff filed an application for SSDI on or before July 10, 2015,[3] alleging a disability onset date of March 1, 2012, due to severe depression, high blood pressure, fibromyalgia, rheumatic fever, anxiety, uterine fibroids, and allergies.  (R. at 118.)  After Plaintiff's claims were initially denied on September 30, 2015 (*id.*, at 128-33), Plaintiff requested a hearing before an administrative law judge ("ALJ") (*id.*, at 134-35).  Plaintiff, represented by counsel and assisted by an interpreter, testified by videoconference before ALJ Paul Barker, at a hearing conducted on September 5, 2018 (the "Hearing") (*id.*, at 54-91).  At the Hearing, the ALJ also heard testimony from Frank Lucas, a vocational expert ("VE").  (*Id.*, at 83-89.)  On October 11, 2018, the ALJ issued an unfavorable decision finding that the Plaintiff was not disabled under the Act.  (*Id.*, at 15-17.)  Plaintiff sought review of the ALJ's decision by the Appeals Council (*id.*, at 237-38), and the ALJ's decision became the Commissioner's final decision when the Appeals Council denied Plaintiff's request for review on September 19, 2019 (*id.*, at 1-5).

### A.    Plaintiff's Personal History

Plaintiff was born on February 26, 1970, such that she was 42 years old as of her alleged disability onset date of March 1, 2012.  (R. at 239.)  Plaintiff received her GED in 1989.  (*Id.*, at 266.)  She testified that she attended high school in the Dominican Republic and that she came to the United States in 1990.  (*Id.*, at 63.)  Plaintiff worked in packaging at a warehouse in 1994, as a home attendant from 1995 to 2011, and as a babysitter in 2011.  (*Id.*, at 266.)

---

[2] The background facts set forth herein are taken from the SSA Administrative Record (Dkt. 20) (referred to herein as "R." or the "Record").

[3] Although a typed "Application Summary" states that an agency representative spoke with Plaintiff on July 10, 2015, and completed her benefits application for her at that time (*see* R. 239), certain of the SSA's records indicate that Plaintiff's application was filed earlier, on May 5, 2015 (*see* R. at 48, 117).

At the Hearing, Plaintiff testified that she lived with her husband and one of her children, who was 14 years old at the time. (*Id.*, at 61-62.) She testified that she had four children, but that the other three were older and out of the house. (*Id.*, at 62.) Plaintiff explained that she spent her days in bed, and that her husband helped her with household chores. (*Id.*, at 77.) She further testified that she occasionally went grocery shopping with her son, that she went to the library twice a week, and that she went to church twice a week. (*Id.*, at 77.)

### B.   Medical Evidence

As Plaintiff reported that her disability began on March 1, 2012, the relevant period under review for purposes of her application for SSDI benefits runs from that date until September 30, 2016, the date when Plaintiff was last insured. *See* 42 U.S.C. §§ 423(a)(1), (c)(1); 20 C.F.R. §§ 404.130, 404.315(a); *Arnone v. Bowen*, 882 F.2d 34, 37 (2d Cir. 1989).[4]

### 1.   Plaintiff's Treatment by Her Primary Care Physician (Dr. Avraham Henoch)

As discussed below, the Record indicates that Plaintiff saw Dr. Avraham Henoch, a family medicine doctor, approximately two dozen times between March of 2014 and August of 2016 (R. at 746-838), and that, in February 2016, he provided a "Comprehensive Evaluation" that set out his opinions as to the extent of Plaintiff's exertional and non-exertional limitations.

---

[4] To be eligible for SSDI benefits, "an applicant must be 'insured for disability insurance benefits.'" *Arnone*, 882 F.2d at 37 (quoting 42 U.S.C. §§ 423(a)(1)(A), 423(c)(1)). "An applicant's 'insured status' is generally dependent upon a ratio of accumulated 'quarters of coverage,'" *i.e.*, quarters in which the applicant earned wages and paid taxes, "to total quarters." *Id.* (citations omitted). To qualify for SSDI benefits, "Plaintiff's disability onset date must fall prior to [her] date last insured." *Camacho v. Astrue*, No. 08-CV-6425, 2010 WL 114539, at *2 (W.D.N.Y. Jan. 7, 2010) (citing *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008)); 20 C.F.R. § 404.315(a).

### a.   Dr. Henoch's Treatment Records
### From 2014 Through January 2016

On May 15, 2014, Plaintiff saw Dr. Henoch and complained of a sore throat.  (*Id.*, at

751.)  Dr. Henoch's notes reflect that, at that appointment, Plaintiff denied back pain, anxiety,

and depression.  (*Id.*, at 751-53.)  Dr. Henoch diagnosed a sore throat and "ear problem," and

prescribed Plaintiff Zithromax.[5]  (*Id.*, at 754.)

Plaintiff saw Dr. Henoch again on October 30, 2014 for an annual physical examination.

(*Id.*, at 755-57.)  While Dr. Henoch's notes from that date reflect that Plaintiff again denied

having symptoms of anxiety and depression (*id.*, at 756), he nevertheless assessed depression, as

well as hypertension (*id.*, at 757).  Plaintiff then returned to Dr. Henoch on February 25, 2015 (at

which time Dr. Henoch noted that Plaintiff was taking Meloxicam[6] and Tizanidine[7] (*id.*, at

758-61)), on April 24, 2015 (*id.*, at 762-65), and on May 5, 2015 (*id.*, at 766-69).  Throughout

these visits, Dr. Henoch continually noted that Plaintiff had "[f]ull range of motion," and that she

denied having anxiety or depression.  (*See id.*, 758-69.)

On May 8, 2015, though, Plaintiff admitted to feeling depressed; at that same visit,

Dr. Henoch prescribed Ciprofloxacin and Nitrofurantoin[8] for an apparent urinary tract infection.

---

[5] Zithromax (Azithromycin), is an antibiotic.  *See* https://medlineplus.gov/druginfo/meds/a697037.html.

[6] Meloxicam is a nonsteroidal anti-inflammatory drug ("NSAID") "used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis . . . [and] rheumatoid arthritis. . . ." *See* https://medlineplus.gov/druginfo/meds/a601242.html.

[7] Tizanidine is a muscle relaxant.  *See* https://medlineplus.gov/druginfo/meds/a601121.html.

[8] Ciprofloxacin and Nitrofuantoin are both antibiotics.  *See* https://medlineplus.gov/druginfo/meds/a688016.html; *see also* https://medlineplus.gov/druginfo/meds/a682291.html.

(*Id.*, at 771-72.)  Upon a referral from Dr. Henoch, Plaintiff received a CT scan of her head on

May 12, 2015, which revealed a "normal exam of the brain."  (*Id.*, at 871-82.)  Plaintiff then saw

Dr. Henoch again on May 19, 2015 (*id.*, at 774-77), on May 28, 2015 (at which time he

prescribed Prednisone[9] (*id.*, at 778-81)), on June 23, 2015 (at which time he prescribed

Cortisporin[10] and Azithromycin[11] (*id.*, at 782-85)), and on June 29, 2015 (*id.*, at 786-89).  Upon a

referral from Dr. Henoch, Plaintiff received an abdominal ultrasound on July 2, 2015, which

revealed normal findings.  (*Id.*, at 879-80.)  Plaintiff returned to Dr. Henoch on July 20, 2015 (at

which time Plaintiff requested Oxycodone[12] "for pain," but Dr. Henoch instead prescribed

Indomethacin[13]) (*id.*, at 790-94), and on October 22, 2015 (at which time Dr. Henoch prescribed

Atorvastatin,[14] Tizanidine,[15] and Meloxicam[16]) (*id.*, at 795-98).  Throughout this period, and

---

[9] Prednisone is a corticosteroid that, among other things, can be used to treat certain types of arthritis.  *See* https://medlineplus.gov/druginfo/meds/a601102.html.

[10] Cortisporin is a combination of antibiotics and a corticosteroid.  It is uses to treat skin infections.  *See* https://medlineplus.gov/druginfo/meds/a601061.html.

[11] *See supra*, at n.5.

[12] Oxycodone is an opiate (narcotic) used to relieve moderate to severe pain.  *See* https://medlineplus.gov/druginfo/meds/a682132.html.

[13] Indomethacin is an NSAID that "is used to relieve moderate to severe pain, tenderness, swelling, and stiffness caused by," among other things, osteoarthritis and rheumatoid arthritis.  *See* https://medlineplus.gov/druginfo/meds/a681027.html.

[14] Atorvastatin is a statin that "slow[s] the production of cholesterol in the body" and is used "to reduce the risk of heart attack and stroke and to decrease the chance that heart surgery will be needed in people who have . . . or who are at rist of developing heart disease."  *See* https://medlineplus.gov/druginfo/meds/a600045.html.

[15] *See, supra*, n.7.

[16] *See, supra*, n.6.

despite Plaintiff's various prescriptions for pain, Dr. Henoch repeatedly noted that Plaintiff had

"[f]ull range of motion."  (*Id.*, at 774-98.)

Plaintiff saw Dr. Henoch again on October 30, 2015, complaining of depression,

fibromyalgia, uterine fibroids,[17] and arthritis.  (*Id.*, at 799-802.)  At this visit, Dr. Henoch did *not*

note "full range of motion," but rather "TMJ"[18] and "Sprain L/S" (presumably referring to the

lumbar and sacral spine).  (*Id.*, at 801.)  On November 2, 2015, Plaintiff received an X-ray of her

lumbar spine, which was "negative" (*id.*, at 870), and an MRI of the lumbar spine, which

revealed "bulge at L5-S1," but was otherwise "unremarkable" (*id.*, at 896).  At Plaintiff's next

visit with Dr. Henoch on November 6, 2015, he noted "bulging disc L/S."  (*Id.*, at 803-06.)

Plaintiff saw Dr. Henoch again on November 23, 2015 (*id.*, at 807-09), on December 14, 2015

(at which time he recorded that Plaintiff "admit[ted] to muscle strains, levoscoliosis, TMJ

syndrome, sprain lumbar, [and] multiple L/S bulging discs," as well as rheumatic fever,

depression, anxiety, neck pain, low back pain, and hand numbness, and that a musculoskeletal

exam revealed "sprain L/S, sprain C/S, bulging disc L/S" (*id.*, at 810-14)), and on January 4,

2016 (*id.*, at 815-18).

---

[17] The Record reflects that, in 2015, Plaintiff was also seen at New York Presbyterian Hospital and Montefiore Medical Center, for uterine fibroids.  (*See* R. at 400-22.)  It appears that, on January 26, 2015, Plaintiff declined treatment for the fibroids (*see id.*, at 415), and that, on July 15, 2015, she went to the Emergency Department due to abdominal pain from the fibroids, but was discharged the same day (*see id.*, at 401-05).

[18] The temporomandibular joint ("TMJ") connects the jaw to the side of the head.  *See* https://medlineplus.gov/temporomandibularjointdysfunction.html.  Temporomandibular joint disfunction, also called TMJ syndrome, can cause, *inter alia*, pain, stiffness, and limited movement of the jaw.  *See id.*

### b.   <u>Dr. Henoch's February 4, 2016 Report</u>

On February 4, 2016, Dr. Henoch prepared a report entitled "Comprehensive Evaluation." (*Id.*, at 567-71.)  In that report, he stated that Plaintiff "continue[d] to have pain because of rheumatoid arthritis and fibromyalgia affecting her whole body," and that "she ha[d] soreness over her entire body." (*Id.*, at 567.)  He reported that Plaintiff was "depressed and anxious all the time," and had difficulty "relating to others." (*Id.*)  He also stated that she had "trouble concentrating and doing even simple things." (*Id.*)  He observed that Plaintiff was "[i]n moderate and marked distress because of anxiety and pain," that she had "diffuse tenderness" on her abdomen, and that "[t]here [were] painful trigger points over the entire spine as well as the shoulders[,] hips[,] arms[,] and legs." (*Id.*, at 568.)  As for Plaintiff's "mental status," Dr. Henoch reported that her "affect was constricted moderately," that "[t]here was a depressed mood noted with anxious features," and that "[d]uring the course of the interview she became anxious and hyperactive but recovered." (*Id.*)  He noted that Plaintiff "stay[ed] home a lot" and "ha[d] difficulty concentrating because of her discomfort and panic attacks," that there was "impairment of attention," and that Plaintiff's "intellectual functioning appeared to be in the average to below average range." (*Id.*)  Dr. Henoch assessed fibromyalgia, rheumatoid arthritis, panic disorder, and bipolar disorder. (*Id.*, at 569.)

Under the heading "Consultations," Dr. Henoch apparently quoted from the 2014 notes of Dr. Vinita Patel, a rheumatologist, and the 2012 notes of Dr. Carmen Moralez, a psychiatrist. (*Id.*, at 569.)  Specifically, Dr. Henoch wrote the following:

> Dr. Vinita Patel – rheumatologist – September 11, 2014.
> '. . . Rheumatoid arthritis . . . Raynauds syndrome[19] . . .
> diagnosed with Junior Rheumatoid Arthritis when she was seven
> years old . . .'
> Carmen Morales – psychiatry – October 1, 2012 '. . . The press
> [sic] for last 22 years Empty and sad most of the time . . . panic
> disorder . . . Agoraphobia . . . Prozac 20 mg . . . Xanax 0.25 mg . . .
> Panic attacks . . . Cymbalta 30 mg daily . . .

(*Id.* (ellipses in original).)

As to Plaintiff's functional abilities, Dr. Henoch opined that Plaintiff was "unable to travel on a regular basis on a bus or subway because of difficulty with prolonged sitting, standing[,] and need to use stairs and incontinence issues." (*Id.*, at 570.) He also opined that Plaintiff was "unable to perform maneuvers such as reaching, pulling, bending, twisting, stooping, and operating motor vehicles, because of her fibromyalgia and rheumatoid arthritis[-]related pain and restriction." (*Id.*) He further expressed the opinion that Plaintiff was "unable to tolerate dust, heights, fumes, and gases because of rheumatologic derangements" (*id.*), that she was "unable to perform reaching, fine manipulation, and using the arms for work activities" (*id.*), that, "because of her chronic recurring pain and trigger point discomfort," she was "unable to sustain prolonged sitting" (*id.*), and that she was "unable to lift, squat, kneel, bend, pull, or push because of her fibromyalgia and rheumatoid pain" (*id.*). He further opined that Plaintiff had an "inability to sustain attention and concentration because of her distraction from her pain and her anxiety" (*id.*), and that she would likely "need to take breaks more than three times a day and be absent more than three times a week" (*id.*), although, somewhat

---

[19] Raynaud's syndrome occurs "when there is a decrease in blood flow to the fingers and toes when someone is exposed to cold weather or stress." https://www.rheumatology.org/I-Am-A/Patient-Caregiver/Diseases-Conditions/Raynauds-Phenomenon.  Raynaud's syndrome may occur "as a result of another disease, such as . . . rheumatoid arthritis." https://www.arthritis.org/diseases/raynaud-s-disease.

confusingly, he also indicated that Plaintiff was likely "to be absent one of [sic] three times a

month" (*id.*).  He opined that Plaintiff had a limited ability to relate to coworkers, and would be

unable to "deal with the public on a regular basis," deal with supervisors and work stresses, "to

function independently of others," "to follow detailed or complex instructions," "to demonstrate

reliability," or "to use public transportation on a regular basis."  (*Id.*)  Dr. Henoch concluded that

Plaintiff was "incapable of performing even minimal sedentary work that would be required for a

six hour a day five day a week job because of the rheumatologic and psychiatric disabilities."

(*Id.*)  He described Plaintiff's prognosis as "guarded and poor," and concluded that "[d]ue to her

painful rheumatologic and psychiatric pathology, [she] should be considered for a total disability

with permanency from all work."  (*Id.*)

### c.     Dr. Henoch's Treatment Records After February 2016

Plaintiff returned to Dr. Henoch for visits on March 2, 2016 (*id.*, at 820-23), on April 4,

2016 (*id.*, at 824-28), on August 24, 2016 (at which time he noted "low back tender to

palpation[,] L-R knee tender to palpation[,] limited ROM" (*id.*, at 829-33)), and on August 31,

2016 (at which time he again reported that Plaintiff had "[f]ull range of motion" (*id.*, at 834-38)).

### 2.     Mental Health Treatment at St. Barnabas Hospital Behavioral Health

### a.     Dr. Pablo Ibanez (Psychiatrist)[20]

The Record reflects that Plaintiff saw Dr. Pablo Ibanez at St. Barnabas Hospital ("SBH")

Behavioral Health for mental health treatment monthly, from July 2013 through September 2016,

the date she was last insured for disability benefits.  (*See* R. at 352-68; 487-93; 528-555;

631-77.)  Throughout that time, Dr. Ibanez treated Plaintiff for panic disorder with agoraphobia

---

[20] Publicly available information indicates that Dr. Ibanez is a psychiatrist.  *See*
http://www.sbhny.org/staff/pablo-ibanez/.

and "major depressive disorder, recurrent, severe without psychotic features." (*See id.*)  In addition, as discussed below, Dr. Ibanez filled out a "Psychiatric/Psychological Report" in January 2016, describing the extent of Plaintiff's psychiatric impairments.

### i.   <u>Treatment by Dr. Ibanez</u>

On July 15, 2013, Plaintiff reported to Dr. Ibanez that she felt tired, anxious, and depressed.  (*Id.*, at 554-55.)  She also reported having a problem with her 23-year-old son because they "did not understand each other."  (*Id.*)  Dr. Ibanez noted that Plaintiff appeared "[c]alm and cooperative" and "well groomed"; that her eye contact was "[f]air"; that her speech had a "[n]ormal rate, rhythm and volume"; that her mood was "[d]epressed and anxious"; that her affect was "[m]ood congruent[] [and] appropriately reactive"; that her thought process was "[l]ogical and coherent with tight associations"; that her memory and attention were "[s]ustained"; that her impulse control was "[g]ood"; and that her judgment and insight were "[f]air."  (*Id.*, at 555.)  Dr. Ibanez further noted that Plaintiff was not having suicidal or homicidal ideations, that she was not having auditory or visual hallucinations, and that she had "no paranoia" and "no IOR."[21]  (*Id.*)  Dr. Ibanez prescribed 0.25 mg of Xanax[22] for panic attacks, 60 mg of Cymbalta[23] daily, and 10 mg of BuSpar[24] three times daily.  (*Id.*)

---

[21] IOR appears to stand for "inhibition of return," and is a "vulnerability marker for schizophrenia."  *See* https://pubmed.ncbi.nlm.nih.gov/30184467/.

[22] Xanax (Alprazolam), is used to treat anxiety and panic disorders.  *See* https://medlineplus.gov/druginfo/meds/a684001.html.

[23] Cymbalta (Duloxetine), is used to treat depression and generalized anxiety disorder, but can also be used to treat certain pain conditions, including fibromyalgia.  *See* https://medlineplus.gov/druginfo/meds/a604030.html.

[24] BuSpar (Buspirone) is used to treat anxiety disorders.  *See* https://medlineplus.gov/druginfo/meds/a688005.html.

Throughout 2013, Plaintiff continued to report feeling anxious and depressed and having difficulty with her children.  (*See id.*, at 544-55.)  Specifically, she variously stated that her 23-year-old son had come back from the Navy and they "did not understand each other" (*id.*, at 554-55); that two of her children had not been getting along and that it was making her sad (*id.*, at 552); that one of her sons did not "cooperate as he should" and was not going to school (*id.*, at 550); that she was worried about her 14-year-old son with ADHD (*id.*, at 547); and that one of her sons was in a "program" and was having difficulty there (*id.*, at 544-45).  During this period, Plaintiff's medication regimen remained unchanged, and Dr. Ibanez's findings upon mental status examinations remained the same, with the exception that, on November 7, 2013, he noted that Plaintiff was "less depressed [and] less anxious."  (*Id.*, at 547.)

Plaintiff continued to see Dr. Ibanez monthly in 2014, during which time her complaints, diagnoses, and medications remained largely the same.  (*Id.*, at 528-44.)  On January 7, 2014, Plaintiff again discussed the problems she was having with her children and explained that her 17-year-old son was then in a "residential program"; that her 14-year-old son was "not obedient," had ADHD and was "on medications"; and that her 23-year-old son "[did] not cooperate with almost anything."  (*Id.*, at 542.)  On May 15, 2014, Dr. Ibanez noted that Plaintiff's affect was "mood congruent, constricted," and increased Plaintiff's dosage of BuSpar from 10mg to 15mg three times daily.  (*Id.*, at 534-35.)  Throughout 2014, Dr. Ibanez continually noted that "no significant changes [were] reported or observed."  (*Id.*, at 528-44.)

Plaintiff's treatment with Dr. Ibanez continued through 2015.  (*Id.*, at 509-28.)  On February 24, 2015, Plaintiff reported that she had been "feeling a little bit better depression and anxiety wi[s]e," that she had been sleeping well, and that "her sons [were] doing a little bit better."  (*Id.*, at 527.)  Dr. Ibanez's notes state that Plaintiff had "an ACS case because her 15 y/o

[had] recently accused her of not feeding him." (*Id.*, at 527.)  Upon a mental status exam,

Dr. Ibanez noted Plaintiff's appearance as "[c]ooperative, well groomed," her mood as

"[d]epressed at times, anxious at times," and her affect as "[m]ood congruent, constricted." (*Id.*,

at 527.)  All other prior findings remained unchanged, as did Plaintiff's diagnoses and

medication regimen. (*Id.*)

On March 24, 2015, Plaintiff reported feeling depressed and having back pain. (*Id.*, at

525.)  She told Dr. Ibanez that she had been thinking about working and that she had taken

classes for two weekends "to be able to take care of children at home," but that "she was told that

since she ha[d] a rented room[,] she [could not] do that." (*Id.*)  Plaintiff further reported that she

had worked as a home attendant in the past, but that, because of her pain, "she could only [do]

that for a few hours right now." (*Id.*)  She also reported that her ACS case had been dismissed.

(*Id.*)  Dr. Ibanez noted that Plaintiff's mood was "[d]epressed, lonely." (*Id.*)

On April 21, 2015, Plaintiff reported that she had been having more pain "all over," from

her head to her feet, and continued to report having problems with her son, who had ADHD.

(*Id.*, at 523.)  Dr. Ibanez increased Plaintiff's Cymbalta dose from 60mg to 90mg daily. (*Id.*, at

524.)  Then, on May 20, 2015, Plaintiff told Dr. Ibanez that she had recently fainted for two to

three minutes. (*Id.*, at 355, repeated at 521.)  Dr. Ibanez noted that Plaintiff's mood was "more

depressed, anxious," and increased Plaintiff's BuSpar dosage from 15mg to 20mg three times

daily. (*Id.*, at 522.)

On August 4, 2015, Dr. Ibanez noted the following results from a mental status exam:

Plaintiff's appearance was "normal"; her eye contact was "average"; her activity was "normal";

her attitude towards the examiner was "cooperative"; her mood was "depressed[] [and] anxious";

her speech was "clear"; her thought process was "logical"; her thought content and perception

were "normal"; she had no suicidal or homicidal ideations; she was oriented x3 (*i.e.*, she was oriented to person, place, and time); her recent and remote memory, as well as her attention and concentration, were "intact"; her impulse control was "adequate"; her insight was "normal"; and her judgment was "fair." (*Id.*, at 519.)  Plaintiff also reported having pain from "fibromas." (*Id.*, at 518.)

On September 20, 2015, Plaintiff told Dr. Ibanez that she had seen a cardiologist and that "her stress test [had been] 'abnormal.'" (*Id.*, at 515.)[25]  She also reported having bone pain and pain in her feet, and stated that she had been worried about her health. (*Id.*)  Dr. Ibanez's findings upon a mental status exam remained the same, except that he noted Plaintiff's affect to be "constricted." (*Id.*, at 516.)  On October 14, 2015, Plaintiff reported that her son was "in crisis" because he had been mugged. (*Id.*, at 512.)  She also reported that he had become aggressive at home, that she had called 911, and that he had been admitted to the "psychiatry unit" in the hospital. (*Id.*)  Dr. Ibanez's treatment notes, including his notes regarding Plaintiff's diagnoses and medications, remained the same through the remainder of the year. (*See id.*, at 509-12.)

Plaintiff's treatment with Dr. Ibanez then continued into 2016. (*Id.*, at 487-508.)  On January 20, 2016, Plaintiff told Dr. Ibanez that she had seen a neurologist, that she had been prescribed Topamax[26] and another medication she could not recall for neck pain and headaches,

---

[25] The Record contains the report of a July 24, 2015 stress test, which revealed that "[e]xercise EKG [was] positive for ischemia." (*Id.*, at 874.)  "Ischemia is any reduction in blood flow resulting in decreased oxygen and nutrient supplies to a tissue." https://www.healthgrades.com/right-care/vascular-conditions/ischemia.  From various points in time, the Record also contains several echocardiogram results, all of which were reported as "normal." (R., at 868, 869, 884, 918.)

[26] Topamax (Topiramate) is an anticonvulsant used to treat certain types of seizures and to prevent migraine headaches.  *See* https://medlineplus.gov/druginfo/meds/a697012.html.

and that the medications had been helping.  (*Id.*, at 506.)  Plaintiff continued to report feeling depressed, having difficulty sleeping, and having problems with her sons.  (*Id.*)  Dr. Ibanez's notes upon a mental status exam remained the same as in 2015, except that he noted that Plaintiff's affect was "mood congruent."  (*Id.*)  Plaintiff's diagnoses and medications remained the same.  (*Id.*, at 507.)

On February 17, 2016, Plaintiff reported feeling depressed and anxious "about her pain." (*Id.*, at 502.)  She also told Dr. Ibanez that her son had been admitted to the "Montefiore Psych unit with the diagnosis of 'bi[p]olar and depression.'"  (*Id.*, at 502-03.)  Dr. Ibanez increased Plaintiff's dose of Cymbalta to 120 mg daily.[27]  (*Id.*, at 504.)

In April and May of 2016, Plaintiff reported feeling depressed due to the recent death of her sister.  (*Id.*, 496, 500.)  On May 18, 2016, Plaintiff also noted that her son had recently been incarcerated.  (*Id.*, at 496.)

Over the course of her remaining monthly visits with Dr. Ibanez in 2016, Plaintiff continued to report feeling depressed and anxious "about her pain," and continued to report having problems with her sons.  (*See, e.g., id.*, at 490-01, 502.)  On July 25, 2016, Dr. Ibanez discontinued Plaintiff's prescription for Cymbalta (noting that she still had symptoms at high doses), and prescribed Effexor.[28]  (*Id.*, at 495.)  On September 29, 2016, Plaintiff reported having financial problems, which "put[] a strain on the relationship with her husband."  (*Id.*, at 487.)

---

[27] There is some disparity in the record from February 2016 forward as to Plaintiff's dosage of Cymbalta.  Under "Outpatient Medications," Plaintiff's Cymbalta dose is listed as 60mg (*see, e.g.*, R. at 504), while under "Plan," Plaintiff's Cymbalta dose is listed as "120mg daily" (*see id.*)

[28] Effexor (Venlafaxine), is used to treat depression.  *See* https://medlineplus.gov/druginfo/meds/a694020.html.

### ii.    <u>Dr. Ibanez's January 2, 2016 Report</u>

On January 7, 2016, Dr. Ibanez filled out a "Psychiatric/Psychological Report," detailing Plaintiff's mental impairments.  (*See id.*, at 564-66.)  Although the Record does not contain treatment notes from Dr. Ibanez for any time prior to July 2013 (*id.*, at 554-55), he stated that Plaintiff had begun receiving treatment on October 20, 2012 (*id.*, at 564).  He also stated that Plaintiff "attend[ed] individual psychotherapy twice a month and receive[d] pharmacological services once a month."  (*Id.*)  He noted diagnoses of agoraphobia with panic attacks, major depressive disorder without psychotic features, "HTN [*i.e.*, hypertension[29]], GERD (*i.e.*, gastroesophageal reflux disease), Vertigo, Abnormal cardiac stress test[, and] fibromas," and "family conflict, poor physical health."  (*Id.*)

When documenting his clinical findings, Dr. Ibanez wrote that Plaintiff "suffer[ed] from severe depressive [] symptoms, which strongly [a]ffect[ed] her mood," and that she also suffered from "poor concentration, poor memory, poor sleep, fatigue, [and] poor motivation."  (*Id.*)  He continued that Plaintiff "ha[d] difficulty being around others, [e]specially in crowded places, becom[ing] very anxious."  (*Id.*)  Dr. Ibanez noted that Plaintiff was taking Xanax, Cymbalta, and BuSpar, and that she reported side effects of drowsiness, sedation, being "easily distracted," and dizziness.  (*Id.*)  Dr. Ibanez indicated that Plaintiff's prognosis, at the time, was "unknown." (*Id.*, at 565.)

When asked to describe "any medically demonstrable signs that indicate[d] [the] presence of psychological or psychiatric mental disorder," Dr. Ibanez wrote that Plaintiff "suffer[ed] from severe depression and anxiety symptoms that strongly [a]ffect[ed] [her] psychomotor movement," and that she also experienced "sleep disturbance and decreased

---

[29] *See* https://medical-dictionary.thefreedictionary.com/HTN.

appetite." (*Id.*)  Dr. Ibanez opined that Plaintiff's psychiatric condition exacerbate[d] her experience of pain, and that Plaintiff's mental impairment "lasted or [could] be expected to last at least twelve months," but that Plaintiff did not have a low IQ or reduced intellectual function, and could "manage benefits in [] her own best interest." (*Id.*)  Dr. Ibanez further opined that Plaintiff was "unable to meet competitive standards" with respect to the following "mental abilities and aptitudes needed to do semiskilled and skilled work":  the ability to understand and remember detailed instructions, to carry out detailed instructions, to set realistic goals or make plans independently of others, to deal with the stress of semiskilled and skilled work, and to repeat sequences of action to achieve a goal or objective.  (*Id.*, at 566.)  With regard to the "mental abilities and aptitude needed to do particular types of jobs," Dr. Ibanez opined that Plaintiff was "unable to meet competitive standards" in interacting appropriately with the general public, displaying social maturity, and adjusting behavior to a work environment and setting. (*Id.*)  He also opined that Plaintiff's abilities were "limited[,] but satisfactory" in responding appropriately to persons in authority, in maintaining socially appropriate behavior, and in adhering to basic standards of neatness and cleanliness.  (*Id.*)  Finally, he opined that Plaintiff's abilities were "seriously limited, but not precluded" with regard to traveling in unfamiliar places and using public transportation." (*Id.*)

### b.   <u>Therapy at SBH Behavioral Health</u>

In addition to being treated by Dr. Ibanez, Plaintiff saw a licensed master social worker, Carlos Rodriguez ("Rodriguez"), and a licensed clinical social worker, Dahlia Wareham

("Wareham"), for therapy at SBH Behavioral Health ("SBH").  Rodriguez and Wareham both appear to have been supervised by Dr. Ibanez.  (*See* R., at 352-59, 365-68, 373-87, 439-51.)[30]

The earliest notes of these therapy sessions in the Record are from October 31, 2013.[31] (*See id.*, at 384-87.)  Treatment notes from that session reflect a diagnosis of "major depression recurrent severe without psychotic features," and also "rheumatic fever, heart murmur, and fibromyalgia."  (*Id.*, at 384.)  At the time, Plaintiff reported that her depression was "being precipitated by issues concerning her sons, mostly her 16 year-old who [did] not want to go to school," and that she became "overwhelmed trying to meet the need[s] of her son, who appear[ed] to be depressed."  (*Id.*, at 385.)  Plaintiff rated the severity of her anxiety and depression as an 8 out of 10.  (*Id.*)  The therapist noted that objectives for Plaintiff's therapy included "developing coping skills to decrease symptoms."  (*Id.*)

The Record indicates that Plaintiff returned to therapy on January 22, 2014 (*id.*, at 381-84), and was then seen at least three more times that year (*see id.*, at 378-81 (April 16, 2014), 376-78 (July 18, 2014), 373-76 (October 20, 2014)), as well as at least three times in 2015 (*see id.*, at 365-68 (January 16, 2015), 352-54 (July 20, 2015), 449-51 (October 20, 2015)), and at least three times in 2016 (*see id.*, at 445-48 (January 20, 2016), 442-45 (April 18, 2016), 439-42 (July 26, 2016)).  Throughout these therapy sessions, Plaintiff continually reported that her depression and anxiety were at a severity level of 8 out of 10.  (*See, e.g., id.*, at 357, 374,

---

[30] The Court notes that the SBH records do not, on their face, indicate whether Dr. Ibanez, Rodriguez, or Wareham actually conducted Plaintiff's therapy sessions, as the treatment notes are signed by all three.  (*See*, *e.g.*, R., at 359, 375, 378, 384.)  When Plaintiff was seen by a consulting psychological examiner, however, she reported "being seen by a therapist named Carlos every two weeks" (*see id.*, at 394; *see also* Background, *infra*, at Section B(3)(b)), suggesting that her usual therapist was Rodriguez.

[31] While the earliest treatment record is from October 31, 2013, it seems like Plaintiff was in therapy beginning as early as October 2012.  (*See infra*, at n.32.)

377, 379, 382.)  The treatment notes also generally reflect that Plaintiff "continue[d] to work on coping skills to decrease [her] symptoms," and that her depression and anxiety were caused by familial issues and "multiple physical health problems."  (*See, e.g., id.*, at 356-59, 635-36.)

On May 29, 2015, Rodriguez filled out a form addressed to "New York State Temporary + Disability Assistance."  (*See id.*, at 350.)  On that form, Rodriguez noted that Plaintiff had been a client at Fordham Tremont Continuing Care Clinic (an affiliate of SBH) since October 16, [2012],[32] and reiterated Plaintiff's diagnosis of major depressive disorder, "recurrent severe without psychotic features."  (*Id.*)

### 3. Consultative Examiners

On August 18, 2015, Plaintiff was examined by two consultative examiners – Dr. Syeda Asad, a doctor of internal medicine, who provided a report regarding Plaintiff's physical conditions (*id.*, at 389-92), and Dr. Tulsa Knox, a psychologist, who provided a report regarding Plaintiff's mental impairments (*id.*, at 394-99).

#### a. Syeda Asad (Internal Medicine)

In assessing Plaintiff's conditions, Dr. Asad noted that Plaintiff's chief complaints were fibromyalgia, rheumatic fever, depression, hypertension, fibroids, asthma, and high cholesterol. (*Id.*, at 389.)  As to Plaintiff's fibromyalgia, Dr. Asad noted Plaintiff's complaint that she was having "constant aching pain in the bilateral hands, shoulders, knees, and ankles," and that the pain was a "6/10 intensity."  (*Id.*)  Dr. Asad further noted that Plaintiff reported feeling dizziness. (*Id.*)  As to Plaintiff's rheumatic fever (which, Dr. Asad indicated, had been diagnosed when

---

[32] Although Rodriguez wrote October 16, *2002*, this was likely an error, as Dr. Ibanez's letter stated that Plaintiff had been receiving treatment since October 2012 (*see id.*, at 564), Plaintiff's therapy records state that her "admission date" was October 16, 2012 (*see, e.g., id.*, at 356, 365, 373), and another letter from Rodriguez dated October 28, 2015 states that Plaintiff had been attending therapy since October 16, 2012 (*id.*, at 423).

Plaintiff was 7 years old), Dr. Asad noted that, at the time of the examination, Plaintiff denied any symptoms from that disease, aside from joint pain.  (*Id.*)  Dr. Asad indicated that Plaintiff had had asthma since 2010, with "trigger factors [of] allergies and pets," and that she used Flovent daily, but that she "denied any history of intubation or hospitalization."  (*Id.*)  Dr. Asad also noted that Plaintiff had been diagnosed with high blood pressure and high cholesterol in 2010, and with fibroids in 2015.  (*Id.*)  Dr. Asad further noted that Plaintiff had had depression for 20 years, that she was compliant with her medications, and that, at the time of the examination, she denied any depressive symptoms.  (*Id.*)  With respect to Plaintiff's past history, Dr. Asad also recorded that Plaintiff had been admitted to the hospital twice in 2015 for pelvic pain due to fibroids.  (*Id.*)

Plaintiff reported to Dr. Asad that she was then taking a number of medications, including Atenolol,[33] Lisinopril,[34] BuSpar, Xanax, Atorvastatin, and Duloxetine (*i.e.*, Cymbalta), and that she received Penicillin injections.  (*Id.*, at 390.)  With respect to her activities of daily living, Dr. Asad indicated that Plaintiff was able to cook three times a week, do laundry, shopping, and childcare once a week, and shower, bathe, and dress herself daily.  (*Id.*)

Upon physical examination, Dr. Asad observed that Plaintiff "appeared to be in no acute distress," that her gait was "normal," that she could "walk on [her] heels and toes without difficulty," that she could squat "full[y]," that her stance was "normal," that she "[u]sed no assistive devices," that she "[n]eeded no help changing for [the] exam or getting on and off [the] exam table," and that she was "[a]ble to rise from [a] chair without difficulty."  (*Id.*)  Dr. Asad

---

[33] Atenolol is used to treat high blood pressure.  *See* https://medlineplus.gov/druginfo/meds/a684031.html.

[34] Lisinopril is also a blood pressure medication.  *See* https://medlineplus.gov/druginfo/meds/a692051.html

found that Plaintiff's heart had a "regular rhythm," that her cervical spine and lumbar spine showed "full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally," and that there were no apparent abnormalities in the thoracic spine.  (*Id.*, at 391.)  Dr. Asad also found that Plaintiff had full range of motion of the shoulders, elbows, forearms, wrists, hips, knees, and ankles bilaterally, that her joints were "stable and nontender," and that there was "no redness, heat, swelling, or effusion."  (*Id.*)  Dr. Asad did find that Plaintiff had certain trigger points for pain, including "two trigger points . . . in the trapezius muscle, two trigger points around the knee, and two trigger points . . . in the low cervical region."  (*See id.*)  Dr. Asad determined, though, that Plaintiff had no muscle atrophy, that her "hand and finger dexterity [was] intact," and that her "grip strength [was] 5/5 bilaterally."  (*Id.*, at 391-92.)   Dr. Asad diagnosed Plaintiff with fibromyalgia, rheumatic fever, depression, hypertension, history of fibroids, asthma, and high cholesterol, and described Plaintiff's prognosis as "good."  (*Id.*, at 392.)

Dr. Asad opined that Plaintiff had "mild limitations for lifting, carrying, or pushing any objects and mild limitations for walking and standing due to the fibromyalgia," for which she noted that six trigger points had evidenced out of the 18 that are considered as diagnostic criteria.[35]  (*Id.*)  Dr. Asad further opined that Plaintiff had "no limitations for bending, squatting, and kneeling," and that she should "avoid allergies, pets, and other respiratory irritants due to the history of asthma."  (*Id.*)

### b.   Tulsa Knox (Psychologist)

In her consultative report, Dr. Knox noted that Plaintiff had taken the bus by herself to the evaluation.  (*Id.*, at 394.)  Dr. Knox also noted that Plaintiff reported having "dysphoric

---

[35] *See* Discussion, *infra*, at Section III(B)(2).

moods," feeling "very down most of the time . . . [with] crying spells four times a day,
particularly this year," due to "her 18-year-old son trying to commit suicide and marijuana
usage." (*Id.*, at 395.) Dr. Knox further noted Plaintiff's report of fatigue and "loss of energy," as
well as social withdrawal, "except for going to church two times a week." (*Id.*) According to
Dr. Knox, Plaintiff began crying during the evaluation, and stated that, while she had taken
parenting classes for help with her children, she felt that "it had not been working." (*Id.*)
Plaintiff reported "always worrying for her family," having difficulty concentrating, and having
heart palpitations, "especially in elevators when there [were] too many people." (*Id.*) Plaintiff
also reported having short-term memory difficulties. (*Id.*, at 396.)

Dr. Knox conducted a mental status exam and noted that Plaintiff's demeanor was
cooperative, her manner of relating was adequate, her intelligibility was fluent, her thought
process was "coherent and goal[-]directed," and her affect was "of full range and appropriate."
(*Id.*) Dr. Knox further noted that Plaintiff was oriented to person, place, and time, and that her
attention and concentration were "mildly impaired due to emotional stress of her current
situation at home." (*Id.*, at 397.) She found that Plaintiff was "able to perform simple
calculations," but had one error when counting "by 2 up to 20" and one error when counting
backwards by 3. (*Id.*) As to Plaintiff's "recent and remote memory skills," Dr. Knox observed
that Plaintiff "[a]ppeared mildly impaired due to emotional distress secondary to depression and
some anxiety of what is going on in her family," and that, while Plaintiff was "able to repeat 3
out of 3 objects immediately," she "was only able to repeat 1 out of 3 objects after five minutes."
(*Id.*) Dr. Knox found that Plaintiff's intellectual functioning was "below average to borderline,"
that her insight was "fair to good," and that her judgment was "fair." (*Id.*) She noted that
Plaintiff was able to dress, bathe, and groom herself, as well as cook and prepare food (*id.*),

although she also noted Plaintiff's report that she had assistance with doing laundry, shopping, and cleaning (*id.*, at 398).

Dr. Knox provided a medical source statement, in which she opined that Plaintiff had no limitations in her ability to maintain a regular schedule or relate "adequately with others"; mild limitations in following and understanding simple directions and instructions and in making appropriate decisions; mild-to-moderate limitations in maintaining attention and concentration, and in learning new tasks; moderate limitations in performing complex tasks independently and in appropriately dealing with stress; and moderate-to-marked limitations in performing simple tasks independently. (*Id.*)

Dr. Knox diagnosed Plaintiff with "persistent depressive order." (*Id.*, at 399.)  She assessed Plaintiff's prognosis as "fair, given the level of stress that [Plaintiff] fe[lt] [because of] her son who ha[d] repeatedly attempted to commit suicide and refuse[d] to take prescribed medication and [who], according to [Plaintiff], [was] involved in trafficking," which had apparently resulted in her family's being threatened at one point. (*Id.*)  In this regard, Dr. Knox also noted Plaintiff's further report of being "very concerned" about another of her sons who had ADHD and was "beginning to engage in usage of recreational cannabis," and her "long history of what she claim[d] to be medical problems." (*Id.*)

### 4.     <u>Non-examining State Agency Consultant</u>

The Record also contains opinion evidence from a state agency psychological consultant, Dr. K. Lieber-Diaz, who reviewed Plaintiff's records and provided a "Disability Determination Explanation." (*Id.*, at 117-27.)  Dr. Lieber-Diaz found that Plaintiff's fibromyalgia was "non[-]severe," that Plaintiff had a disorder "of the female genital organs," which was also "non[-]severe," and that Plaintiff had an anxiety disorder, which was "severe." (*Id.*, at 121.)

Dr. Lieber-Diaz opined that Plaintiff's "restriction of activities of daily living" was "mild," that her "difficulties in maintaining social functioning" were "mild," and that her "difficulties in maintaining concentration, persistence or pace" were "moderate." (*Id.*, at 122.) Dr. Lieber-Diaz also opined that Plaintiff was "moderately limited" in: her "ability to understand and remember detailed instructions" (*id.*, at 123), her "ability to carry out detailed instructions" (*id.*, at 124), her "ability to sustain an ordinary routine without special supervision" (*id.*), her "ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods" (*id.*), and her "ability to respond appropriately to changes in the work setting" (*id.*, at 125). In other areas, including "the ability to carry out very short and simple instructions," "the ability to maintain attention and concentration for extended periods," "the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances," "the ability to interact appropriately with the general public," and "the ability to travel in unfamiliar places or use public transportation," Dr. Lieber-Diaz opined that Plaintiff was "not significantly limited." (*Id.*, at 124-25.)

Overall, Dr. Lieber-Diaz concluded that Plaintiff "retain[ed] the functional capacity to perform unskilled work activity" (*id.*, at 126), and determined that Plaintiff was "not disabled" (*id.*).

### C.    Plaintiff's Testimony Before the ALJ

On September 5, 2018, Plaintiff, represented by an attorney and assisted by an interpreter, testified at the Hearing before the ALJ. (R. at 61-82.) Plaintiff testified that she lived with her husband and her 14-year-old son. (*Id.*, at 61-62.) She testified that she completed high school in the Dominican Republic and came to the United States in 1990. (*Id.*, at 63.) She

stated that she had been taking English classes for about a year.  (*Id.*, at 64.)  The ALJ asked

about Plaintiff's ability to find work "in childcare," given that she was not fluent in English, and

Plaintiff stated that she had tried to "take care of a little girl, the daughter of one of [her]

friends," but that she could not continue "because [she] was falling asleep with the child in [her]

arms."  (*Id.*, at 64-65.)  The ALJ further inquired as to whether Plaintiff had completed any

vocational or work training since high school, and Plaintiff stated that she had studied to be a

home attendant, and received a certificate "a while ago," but it had since expired.  (*Id.*, at 65.)

Plaintiff testified that, until 2011, she had worked for "Family Care Services," where she

took care of "elderly people, and sometimes children with disabilities."  (*Id.*, at 66-67.)  She

worked four to six hours per day, earning between $9.00 and $12.00 per hour.  (*Id.*, at 68.)  She

explained that, for that job, she had to lift patients "into the chair or take them to the bathroom"

(*id.*, at 68), and, when asked what the heaviest weight was that she had to lift, she said that her

last patient had been approximately 250 pounds, and that she had needed to "help her and

support her" (*id.*, at 69).  She later testified that, aside from her patients, the largest object she

would have needed to lift or carry was 20 pounds.  (*Id.*, at 81.)  She stated that she left that job

because her medicine made her dizzy and she was often absent because of doctors'

appointments.  (*Id.*, at 69.)

The ALJ asked Plaintiff to describe the physical and mental limitations that she felt

prevented her from working.  (*Id.*, at 70.)  She stated that, at seven years old, she had been

diagnosed "with a very painful illness," which she clarified was rheumatic fever; that she felt a

lot of pain; and that the medication made her sleepy.  (*Id.*, at 70-71.)  She stated that, for the

rheumatic fever, she received injections in her feet.  (*Id.*, at 71.)  She also testified that her

psychiatrist had also diagnosed her with depression and panic attacks (*id.*, at 72), and that she

had panic attacks "about two or three times a year" (*id.*).  When the ALJ asked about her symptoms of depression, she testified, "I feel bad, because I like to work, and I feel different, and I like to be independent . . . and sometimes people make fun of me, because they don't believe me when I tell them how I feel."  (*Id.*)

Plaintiff also testified that she had fibromyalgia, which she described as "a sort of pain of the skin or the muscle."  (*Id.*, at 73.)  The ALJ then asked Plaintiff's attorney, Eric Scriber, if he could identify "in the record a place where any of [Plaintiff's] doctors [had] actually performed an examination . . . where fibromyalgia was actually diagnosed."  (*Id.*)  Mr. Scriber directed the ALJ to Dr. Henoch's February 4, 2016 report, but, upon review of that report, the ALJ stated, "[t]hat document is not – that's not a diagnosis of fibromyalgia[,] I mean, he says that she has fibromyalgia . . . but I'm talking about a diagnosis that follows the diagnostic criteria for fibromyalgia . . . where they examine for tender points . . . there's a diagnostic criteria."  (*Id.*, at 74.)  The ALJ further stated that if fibromyalgia is "not diagnosed following that diagnostic criteria, then we cannot consider it [a medically determinable impairment]."  (*Id.*)

The ALJ then asked if Plaintiff had any other impairments that prevented her from working, and she testified, "I have arthritis . . . and a dull ache that hurts a lot, and it gets very swollen."  (*Id.*, at 75.)  She also testified that she took medication for this condition, but that the medication made her sleepy.  (*See id.* (testifying that she would "sleep during the day" and not sleep at night).)

When asked how long she could stand and walk, Plaintiff replied, "[a]bout 15 minutes," and said that, after 15 minutes, she would need to sit or lie down.  (*Id.*, at 74-75.)  She stated that her hips, back, and feet bothered her as well.  (*Id.*, at 75.)  She testified that she could sit for 15 or 20 minutes, and that she could climb stairs, but that she could not squat "because [her] feet

[were] deformed," clarifying that she "[had] a bunion, and [needed] surgery." (*Id.*, at 76.)  She testified that she could kneel "a little," that she could not crawl due to pain, and that she could do household chores with help from her family.  (*Id.*, at 76-77.)  As noted above, she further testified that she went to the library twice a week and to church twice a week.  (*Id.*, at 77.)  She stated that she used the bus to get around.  (*Id.*, at 63.)

Mr. Scriber then questioned Plaintiff.  (*Id.*, at 78.)  Upon that questioning, Plaintiff testified that she was able to dress and bathe herself, but that she needed help in remembering to take her medications, and that she slept "about four or five" hours during the day.  (*Id.*)  She also testified that, in addition to Dr. Henoch, she saw a heart doctor, but did not mention the doctor's name.  (*Id.*, at 79.)  She stated that she had a heart murmur, high blood pressure, and tachycardia,[36] and that the medication she took for these conditions made her sleepy.  (*Id.*)  Mr. Scriber asked Plaintiff if there were any circumstances that limited her ability to take the bus, and she replied, "[o]nly when I go to my son's school," because "I get confused."  (*Id.*, at 80-81.)  She also testified that she had problems dealing with crowds because she sometimes had panic attacks when around a lot of people.  (*Id.*, at 81.)

### D.    The VE's Testimony Before the ALJ

VE Frank Lucas testified at the Hearing regarding Plaintiff's ability to perform jobs in the national economy.  (*See id.*, at 83-89.)  The ALJ inquired of the VE as to whether jobs were available for a hypothetical person of Plaintiff's age, education, and work experience, with the mental limitations that the person could "understand, remember and carry out simple tasks but not at an assembly line rate," "make simple work-related decisions," and "have occasional

---

[36] "Tachycardia is the medical term for a heart rate over 100 beats per minute." https://www.mayoclinic.org/diseases-conditions/tachycardia/symptoms-causes/syc-20355127.

changes in the work setting." (*Id.*, at 85.)  The VE responded that the hypothetical person would not be able to perform Plaintiff's past work as a home attendant, but that other jobs were available in the market, including "marker" (DOT 209.587-034), "cleaner" (DOT 323.687-0.14), and "kitchen helper" (DOT 318.687-010).  (*Id.*)

The ALJ then asked the VE to assume further that the hypothetical individual could also "lift and carry, push and pull 50 pounds occasionally and 25 pounds frequently," "stand or walk for six hours of an eight-hour workday," "sit for six hours of an eight-hour workday," and "frequently stoop, balance, kneel, crawl, crouch and climb ramps and stairs and ladders and ropes and scaffolds." (*Id.*, at 86.)  When asked whether such a hypothetical person could perform work in the national economy, the VE responded that "[t]he jobs put forth in hypothetical one would remain under this hypothetical." (*Id.*)

The ALJ then proceeded to ask the VE to assume a person with the same mental limitations described above, but who could "lift and carry, push and pull 20 pounds occasionally and ten pounds frequently," "stand and walk for six hours of an eight-hour workday and sit for six hours of an eight-hour workday," "occasionally stoop, climb ramps and stairs, balance, kneel, crawl and crouch," but could never "climb ladders, ropes or scaffolds." (*Id.*, at 86-87.)  The ALJ asked whether such a person could perform any work in the national economy.  (*Id.*, at 87.)  The VE responded that the positions of "marker" and "cleaner" would remain, but that he would trade the position of "kitchen helper" for the position of a "cafeteria attendant" (DOT 311.677-010).  (*Id.*)  The ALJ then asked the VE to further assume that the person would require "an allowance for time off task of at least 20% of an eight-hour workday beyond regular breaks," and asked whether jobs existed in the national economy for such a person.  (*Id.*)  The VE responded,

"[t]hat degree being off task would be outside of employer tolerances, and without an accommodation, there would be no jobs."  (*Id.*)

Mr. Scriber then asked the VE whether the jobs he mentioned would "require interactions with either supervision, coworkers, or the general public," and the VE responded, "[t]here would be some interaction, yes."  (*Id.*, at 88.)

The ALJ then asked a final question of the VE, which was, "If I were to add a limitation that this hypothetical individual could only have occasional contact with supervisors, coworkers and the general public, would those jobs still remain?" to which VE Lucas responded, "Yes, they would."  (*Id.*, at 89.)

### E.   The Current Action and the Motion Before the Court

Plaintiff commenced this action on November 19, 2019, by filing a form *pro se* Complaint, by which, without further elaboration, she asked the Court to "modify or reverse the decision of the defendant."  (S*ee* Complaint, dated Nov. 19, 2019 ("Compl.") (Dkt. 2).)  Plaintiff also filed a request to proceed *in forma pauperis* (*see* Dkt. 1), which was granted on November 21, 2019 (Dkt. 4).

### 1.   Defendant's Motion For Judgment on the Pleadings

On July 15, 2020, Defendant filed a motion for judgment on the pleadings in favor of the Commissioner.  (*See* Dkt. 23; *see also* Dkt. 24 (Memorandum of Law in Support of the Commissioner's Motion for Judgment on the Pleadings, dated July 14, 2020 ("Def. Mem.")).)  Defendant argued that the Commissioner's final decision was supported by substantial evidence, and that the ALJ had properly evaluated both the medical opinion evidence in the record and Plaintiff's testimony, in determining that Plaintiff had the residual functional capacity ("RFC") to perform light work, with certain non-exertional limitations, and was not disabled under the

Act.  (*See generally id.*)  According to the Docket, Defendant served its motion on Plaintiff by

FedEx on the date it was filed.  (*See* Certificate of Service (Dkt. 26).)

### 2.   Plaintiff's Opposition and
### Submission of Additional Medical Records

Under the Court's Order of Service and Scheduling Order, Plaintiff's response to

Defendant's motion would have been due in August 2020 (*see* Dkt. 7), but the Court did not

receive any submission from Plaintiff until October 2, 2020.  On that date, Plaintiff filed a letter

stating, "I d[i]sagree with the motion given in my case in July for the reason that I did not

rec[e]ive[] the docume[n]t.  [A]nd d[ue] to my health and not under[s]tanding the langu[ag]e I

did not re[s]pond on time."  (*See* Dkt. 25.)

While Plaintiff's letter did not address the substance of Defendant's motion, Plaintiff

attached certain records from Montefiore Medical Center.  (*See id.*)  These records related to a

two-day hospital admission in August 2020 – almost four years past the date when Plaintiff was

last insured and nearly two years past the date of the ALJ's decision (*see id.* (records dated

August 24-26, 2020)) – and, given their dates, the Court notes that Plaintiff may have submitted

these records to demonstrate why she did not timely respond to Defendant's motion.  In any

event, the records show that Plaintiff's chief complaint at the time was a panic attack; the records

also indicate that Plaintiff was then diagnosed with an "altered mental status [and]

hyponatremia."[37]  (*See id.*, at 2.)  Upon discharge from the hospital, it was concluded that

Plaintiff had been "delirious due to a medical condition (likely hyponatremia)," as opposed to a

"psychiatric concern."  (*Id.*, at 15.)

---

[37] "Hyponatremia occurs when the concentration of sodium in your blood is abnormally low."  https://www.mayoclinic.org/diseases-conditions/hyponatremia/symptoms-causes/syc-20373711.

### 3.    The Court's Conference With the Parties

In light of Plaintiff's statement that she had had difficulty understanding Defendant's

motion, and to address the fact that Plaintiff had submitted additional medical records, the Court

held a telephone conference with the parties on October 16, 2020; Plaintiff's son participated in

that conference to serve as an interpreter for Plaintiff.  Following the conference, the Court

issued an Amended Scheduling Order, memorializing the rulings it had made on the record.

(Dkt. 27.)  Specifically, the Court directed Defendant to serve and file a reply by November 2,

2020, addressing Plaintiff's newly submitted Montefiore records, and providing the Court with

Defendant's position as to whether those records should be considered.  (*Id*.)  In addition, the

Court afforded Plaintiff an opportunity to respond to Defendant's reply, if she wished, giving her

a deadline of November 30, 2020 to do so.

### 4.    Defendant's Reply

Defendant filed a reply on October 29, 2020, arguing that "nothing in [P]laintiff's

submission overcomes the Commissioner's showing in [the] initial memorandum of law that the

ALJ's decision is free of legal error and based on substantial evidence," and that the Court

should decline to remand for consideration of additional evidence.  (Defendant's Reply

Memorandum in Support of the Commissioner's Motion for Judgment on the Pleadings, dated

Oct. 29, 2020 ("Def. Reply") (Dkt. 28), at 3.)

More specifically, Defendant argued that, in order to remand for consideration of new

evidence, a showing must be made that (1) the new evidence is "material," which requires "a

reasonable possibility that the new evidence would have influenced the Commissioner to decide

the application differently," and (2) there is "good cause for failure to incorporate such evidence

into the record in a prior proceeding."  (*Id.*, at 3-4.)  Defendant noted that the Montefiore records

dated from August 24-26, 2020, "nearly two years after the end of the period at issue in this case,

October 5, 2018, which was the date the ALJ issued his decision denying disability."  (*Id.*, at 4.)

As the records "reflect[ed] treatment that occurred long after the relevant period," Defendant

argued that that could not be material to Plaintiff's claim.  (*Id.*)  Defendant further asserted that,

while the Montefiore records show that Plaintiff was admitted to the hospital due to an "altered

mental state," they also suggest that Plaintiff's symptoms were due, at that time, to an

"imbalance in her electrolytes[,] rather than panic attacks or depression."  (*Id.*)

**5.      Plaintiff's Further Response**

On November 17, 2020, the Court received a short letter from Plaintiff, stating, in its

entirety:  "In response to the document #27 [the Court's Amended Scheduling Order] that I

received, I do not agree with your answer to deny my case[] because I don't feel able to work

especially under psychiatric medicine."  (Dkt. 29.)  In addition, Plaintiff attached a letter dated

November 12, 2020 from her therapist, Rodriguez, which states:

> The following is to confirm that [Plaintiff] . . . has been a client
> here at the Community Recover Services SBH Behavioral
> outpatient mental health clinic since 10/16/2012.  [Plaintiff] was
> diagnosed Agoraphobia with Panic Attacks F40.01 and Major
> Depression Disorder without Psychotic Features F32.2 (using
> DSM V).  [Plaintiff] receives pharmacological services once a
> month and is prescribed Paxil 40mg and Vistaril 25 mg. 40 mg.
> [Plaintiff] attends individual therapy sessions twice a month. . . .
> [Plaintiff] is in compliance with her mental health treatment. . . .

(*Id.*)[38]

---

[38] Paxil (Paroxetine) is used to treat depression, and Vistaril (Hydroxizine) can be used, *inter alia*, to treat anxiety.  *See* https://medlineplus.gov/druginfo/meds/a698032.html; see also https://medlineplus.gov/druginfo/meds/a682866.html.

## DISCUSSION

I.   **APPLICABLE LEGAL STANDARDS**

    A.   **Judgment on the Pleadings**

Judgment on the pleadings under Rule 12(c) is appropriate where "the movant establishes 'that no material issue of fact remains to be resolved,'" *Guzman v. Astrue*, No. 09cv3928 (PKC), 2011 WL 666194, at *6 (S.D.N.Y. Feb. 4, 2011) (quoting *Juster Assocs. v. City of Rutland*, 901 F.2d 266, 269 (2d Cir. 1990)), and a judgment on the merits can be made "'merely by considering the contents of the pleadings,'" *id*. (quoting *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988)).

Judicial review of a decision of the Commissioner is limited.  The Commissioner's decision is final, provided that the correct legal standards are applied and findings of fact are supported by substantial evidence.  42 U.S.C. § 405(g); *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000).  "[W]here an error of law has been made that might have affected the disposition of the case, [a] court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984) (citation omitted)).  Thus, the first step is to ensure that the Commissioner applied the correct legal standards.  *See Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987).

The next step is to determine whether the Commissioner's decision is supported by substantial evidence.  *See Tejada*, 167 F.3d at 773.  Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal citation and quotation marks omitted).  In making

this determination, a court must consider the underlying record.  The reviewing court does not, however, decide *de novo* whether a claimant is disabled.  *See Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002) ("Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, we will not substitute our judgment for that of the Commissioner."); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997).  Thus, if the correct legal principles have been applied, the Court must uphold the Commissioner's decision upon a finding of substantial evidence, even where contrary evidence exists.  *See Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder."); *see also DeChirico v. Callahan*, 134 F.3d 1177, 1182-83 (2d Cir. 1998) (affirming decision where substantial evidence supported both sides).

## B.    The Five-Step Sequential Evaluation

To be entitled to disability benefits under the Act, a claimant must establish his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998).  An individual is considered to be under a disability only if the individual's physical or mental impairments are of such severity that he or she is not only unable to do his or her previous work, but also cannot, considering his or her age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy.  42 U.S.C. § 423(d)(2)(A).

In evaluating a disability claim, an ALJ must follow the five-step procedure set out in the regulations governing the administration of Social Security benefits.  *See* 20 C.F.R.

§ 404.1520; *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam). Throughout the inquiry, the ALJ must consider four primary sources of evidence: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (citations omitted).

The first step of the inquiry requires the ALJ to determine whether the claimant is engaged in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). If not, at the second step, the ALJ determines whether the claimant has a "severe" impairment or combination of impairments that significantly limits his or her physical or mental ability to do basic work activities. *Id.* §§ 404.1520(a)(4)(ii), (c). If the claimant does suffer from such an impairment, then the third step requires the ALJ to determine whether this impairment meets or equals an impairment listed 20 C.F.R. Pt. 404, Subpt. P, App'x 1 (the "Listings"). *Id.* § 404.1520(a)(4)(iii). If it does, then the claimant is presumed to be disabled "without considering [the claimant's] age, education, and work experience." *Id.* § 404.1520(d).

Where the claimant alleges a mental impairment, Steps Two and Three require the ALJ to apply a "special technique," outlined in 20 C.F.R. § 404.1520a, to determine the severity of the claimant's impairment at Step Two, and to determine whether the impairment satisfies Social Security regulations at Step Three.[39] *See Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008). If the claimant is found to have a "medically determinable mental impairment," the ALJ must

---

[39] Pursuant to 81 Fed. Reg. 66138-01 (S.S.A. Sept. 26, 2016), the SSA revised the criteria in the Listing of Impairments (the "Listing," 20 C.F.R. Pt. 404, Subpt. P, App. 1) used to evaluate claims involving mental disorders under Titles II and XVI of the Act, effective January 17, 2017. These revisions impacted various relevant portions of 20 C.F.R. §§ 404 and 416; *see Brothers v. Colvin*, No. 7:16cv100 (MAD), 2017 WL 530525, at *4 n.2 (N.D.N.Y. Feb. 9, 2017).

"specify the symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s)," then "rate the degree of functional limitation resulting from the impairment(s) in accordance with paragraph (c) of [Section 404.1520a]," which specifies four broad functional areas:  (1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace; and (4) episodes of decompensation.[40]  20 C.F.R. §§ 404.1520a(b), (c)(3); *see Kohler*, 546 F.3d at 265.  The functional limitations for these first three areas are rated on a five-point scale of "[n]one, mild, moderate, marked, [or] extreme," and the limitation in the fourth area (episodes of decompensation) is rated on a four-point scale of "[n]one," "one or two," "three," or "four or more."  20 C.F.R. § 404.1520a(c)(4).

If the claimant's impairment does not meet or equal a listed impairment, then the ALJ must determine, based on all the relevant evidence in the Record, the claimant's RFC, or ability to perform physical and mental work activities on a sustained basis.  *Id.* § 404.1545.  The ALJ then proceeds to the fourth step of the inquiry, which requires the ALJ to determine whether the claimant's RFC allows the claimant to perform his or her "past relevant work."  *Id.* § 404.1520(a)(4)(iv).  Finally, if the claimant is unable to perform his or her past relevant work, the fifth step requires the ALJ to determine whether, in light the claimant's RFC, age, education, and work experience, the claimant is capable of performing "any other work" that exists in the national economy.  *Id.* §§ 404.1520(a)(4)(v), (g).

---

[40] "Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace."  *Morales v. Colvin*, No. 13cv4302 (SAS), 2014 WL 7336893, at *8 (S.D.N.Y. Dec. 24, 2014) (quoting *Kohler*, 546 F.3d at 266 n.5).

On the first four steps of the five-step evaluation, the claimant generally bears the burden of establishing facts to support his or her claim.  *See Berry*, 675 F.2d at 467 (internal citation omitted).  At the fifth step, the burden shifts to the Commissioner to "show that there is work in the national economy that the claimant can do."  *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009).  The Commissioner must establish that the alternative work "exists in significant numbers" in the national economy and that the claimant can perform this work, given his or her RFC and vocational factors.  20 C.F.R. § 404.1560(c)(2).

Where the claimant only suffers from exertional impairments, the Commissioner can satisfy this burden by referring to the Medical-Vocational Guidelines, set out in 20 C.F.R. Pt. 404, Subpt. P, App'x 2 (commonly referred to as the "grids").  Where, however, the claimant suffers non-exertional impairments, such as visual impairment, psychiatric impairment, or pain, that "'significantly limit the range of work permitted by his [or her] exertional limitations,' the ALJ is required to consult with a vocational expert," rather than rely exclusively on these published guidelines.  *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (quoting *Bapp v. Bowen*, 802 F.2d 601, 604-05 (2d Cir. 1986) (internal citations omitted)).

### C.   <u>Duty To Develop the Record</u>

"Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record," *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996) (citing *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982)), and failure to develop the record may be grounds for remand, *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999); *accord Craig v. Comm'r of Soc. Sec.*, 218 F. Supp. 3d 249, 262 (S.D.N.Y. 2016) (noting that "[r]emand is appropriate where this duty is not discharged").  Indeed, "where there are deficiencies in the record, an ALJ is under an affirmative

obligation to develop a claimant's medical history 'even when the claimant is represented by

counsel.'"  *Rosa*, 168 F.3d at 79 (quoting *Perez*, 77 F.3d at 47).

The SSA regulations explain this duty to claimants this way:

> Before we make a determination that you are not disabled, we will
> develop your complete medical history . . . [and] will make every
> reasonable effort to help you get medical reports from your own
> medical sources when you give us permission to request the
> reports. . . .  'Every reasonable effort' means that we will make an
> initial request for evidence from your medical source and, at any
> time between 10 and 20 calendar days after the initial request, if
> the evidence has not been received, we will make one follow[-]up
> request to obtain the medical evidence necessary to make a
> determination.

20 C.F.R. §§ 404.1512(b)(1), (b)(1)(i).  "[I]f the documents received lack any necessary

information, the ALJ should recontact the treating physician."  *Oliveras ex rel. Gonzalez v.

Astrue*, No. 07cv2841 (RMB) (JCF), 2008 WL 2262618, at *6 (S.D.N.Y. May 30, 2008), *report

and recommendation adopted*, 2008 WL 2540816 (June 25, 2008).  The ALJ also has the

authority to subpoena medical evidence on behalf of the claimant, 42 U.S.C. § 405(d), but is not

required to subpoena medical records if they are not received following two ordinary requests,

*Gonell De Abreu v. Colvin*, No. 16cv4892 (BMC), 2017 WL 1843103, at *5 (E.D.N.Y. May 2,

2017); 20 C.F.R. § 404.950(d)(1).

The SSA regulations further explain that a claimant's "complete medical history" means

the records of his or her "medical source(s)."  20 C.F.R. § 404.1512(b)(1)(ii).  If the information

obtained from medical sources is insufficient to make a disability determination, or if the ALJ is

unable to seek clarification from treating sources, the regulations also provide that the ALJ

should ask the claimant to attend one or more consultative evaluations.  *Id.* §§ 404.1512(b)(2),

404.1517.  Where, however, there are no "obvious gaps" in the record and where the ALJ

already "possesses a 'complete medical history,'" the ALJ is "under no obligation to seek additional information in advance of rejecting a benefits claim." *Rosa*, 168 F.3d at 79 n.5.

The question of "[w]hether the ALJ has met his duty to develop the record is a threshold question.  Before reviewing whether the Commissioner's final decision is supported by substantial evidence . . . the court must first be satisfied that the ALJ provided plaintiff with a full hearing under the Secretary's regulations and also fully and completely developed the administrative record." *Craig*, 218 F. Supp. 3d at 261-62 (internal quotation marks and citations omitted); *see also* 42 U.S.C. § 405(g).  Further, the court must satisfy itself that the administrative record has been adequately developed, regardless of whether the issue is raised by the plaintiff.  *See Castillo v. Comm'r of Soc. Sec.*, No. 17cv09953 (JGK) (KHP), 2019 WL 642765, at *7 (S.D.N.Y. Feb. 15, 2019) (noting that, even where the plaintiff does not argue that an ALJ failed to develop the record, the court "is nevertheless obliged to conduct its own independent assessment of whether the ALJ properly discharged this duty").

### D.   **The Treating Physician Rule**

Under the so-called "treating physician rule,"[41] the medical opinion of a treating source as to "the nature and severity of [a claimant's] impairments" is entitled to "controlling weight," where the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2).  "Treating source" is defined as the claimant's "own physician, psychologist, or other acceptable medical source who . . . has provided [the claimant] with medical treatment or evaluation" and who has had "an ongoing treatment relationship" with him

---

[41] In accordance with Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 11 (Jan. 18, 2017), the treating physician rule, as described herein, will no longer be in effect for applications made to the SSA on or after March 27, 2017.

or her.  *Id.* § 404.1502.  Treating physicians' opinions are generally accorded deference because treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture" of a claimant's condition and "bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations."  *Id.* § 404.1527(c)(2); *see Taylor v. Barnhart*, 117 F. App'x 139, 140 (2d Cir. 2004) (Summary Order).

Where an ALJ determines that a treating physician's opinion is not entitled to "controlling weight," the ALJ must "give good reasons" for the weight accorded to the opinion.  20 C.F.R. § 404.1527(c)(2).  Failure to "give good reasons" is grounds for remand.  *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004) ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion . . . .").  Moreover, in determining the weight to be accorded to an opinion of a treating physician, the ALJ "must apply a series of factors," *Aronis v. Barnhart*, No. 02cv7660 (SAS), 2003 WL 22953167, at *5 (S.D.N.Y. Dec. 15, 2003) (citing, *inter alia*, 20 C.F.R. § 404.1527(d)(2)[42]), including:  (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including whether the treatment received was particular to the claimant's impairment; (3) the supportability of the physician's opinion; (4) the consistency of the physician's opinion with the record as a whole; and (5) the specialization of the physician providing the opinion, 20 C.F.R. §§ 404.1527(c)(2)-

---

[42] On February 23, 2012, the Commissioner amended 20 C.F.R. § 404.1527, by, among other things, removing paragraph (c), and re-designating paragraphs (d) through (f) as paragraphs (c) through (e).

(5);  *see Shaw*, 221 F.3d at 134 (noting that these five factors "must be considered when the treating  physician's opinion is not given controlling weight").

Even where a treating physician's opinion is not entitled to "controlling weight," it is generally entitled to "more weight" than the opinions of non-treating and non-examining sources.  20 C.F.R. § 404.1527(c)(2); *see* SSR 96-2p (S.S.A. July 2, 1996) ("In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight."); *see also Gonzalez v. Apfel*, 113 F. Supp. 2d 580, 589 (S.D.N.Y. 2000).  A consultative physician's opinion, by contrast, is generally  entitled to "little weight."  *Giddings v. Astrue*, 333 F. App'x 649, 652 (2d Cir. 2009) (Summary Order) (internal quotation marks and citation omitted).  This is because consultative examinations "are often brief, are generally performed without benefit or review of the claimant's medical history, and, at best, only give a glimpse of the claimant on a single day." *Simmons v. U.S. R.R. Ret. Bd.*, 982 F.2d 49, 55 (2d Cir. 1992) (internal quotation marks and citations omitted).  The opinions of consultative physicians, though, "can constitute substantial evidence in support of the ALJ's decision" when the opinion of a claimant's treating physician cannot be obtained.  *Sanchez v. Commissioner of Social Sec.*, No. 15cv4914, 2016 WL 8469779, at *10 (S.D.N.Y. Aug. 2, 2016), *report and recommendation adopted*, 2017 WL 979056 (Mar. 13, 2017).

### E.   Assessment of a Claimant's Subjective Complaints

Assessment of a claimant's subjective complaints about his or her symptoms or the effect of those symptoms on the claimant's ability to work involves a two-step process.  Where a claimant complains that certain symptoms limit his or her capacity to work, the ALJ is required, first, to determine whether the claimant suffers from a "medically determinable impairment[ ]

that could reasonably be expected to produce" the symptoms alleged.  20 C.F.R.

§ 404.1529(c)(1).  Assuming the ALJ finds such an impairment, then the ALJ must take the

second step of "evaluat[ing] the intensity and persistence of [the claimant's] symptoms,"

considering "all of the available evidence," to determine "how [the] symptoms limit [the

claimant's] capacity for work."  *Id.* § 404.1529(c)(1).  In doing so, the ALJ must consider all of

the available evidence, and must not "reject [ ] statements about the intensity and persistence" of

the claimant's symptoms "solely because the available objective medical evidence does not

substantiate [the claimant's] statements."  *Id.* § 404.1529(c)(2).  Instead, where the claimant's

contentions regarding his or her symptoms are not substantiated by the objective medical

evidence, the ALJ must evaluate the claimant's statements in relation to the objective evidence

and other evidence, in order to determine the extent to which the claimant's symptoms affect his

or her ability to do basic work activities.  *Id.* § 404.1529(c)(3)-(4); *see also* SSR 16-3p.[43]

    While an ALJ is required to take a claimant's reports of his or her limitations into account

in evaluating his or her statements, an ALJ is "not required to accept the claimant's subjective

---

[43] Effective on March 28, 2016, SSR 16-3p superseded SSR 96-7p, which had required the ALJ to make a finding on the credibility of the claimant's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms, where those statements are not substantiated by objective medical evidence.  *See* SSR 96-7p (S.S.A. July 2, 1996).  The new ruling, SSR 16-3p, eliminates the use of the term "credibility" from the SSA's sub-regulatory policy, in order to "clarify that subjective symptom evaluation is not an examination of an individual's character."  SSR 16-3p (S.S.A. Mar. 28, 2016).  Instead, adjudicators are instructed to "consider all of the evidence in an individual's record when they evaluate the intensity and persistence of symptoms after they find that the individual has a medically determinable impairment(s) that could reasonably be expected to produce those symptoms."  *Id.* Both the two-step process for evaluating an individual's symptoms and the factors used to evaluate the intensity, persistence and limiting effects of an individual's symptoms remain consistent between the two rulings.  *Compare* SSR 96-7p *with* SSR 16-3p.  As the ALJ's decision in this matter was issued after the new regulation went into effect, the Court will review the ALJ's evaluation of Plaintiff's statements regarding the intensity of her symptoms under the later regulation, SSR 16-3p.

complaints without question."  *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010).  To the extent

the ALJ determines that the claimant's statements are not supported by the medical record,

however, the ALJ's decision must include "specific reasons for the weight given to the

individual's symptoms, be consistent with and supported by the evidence," and the reasons must

be "clearly articulated" for a subsequent reviewer to assess how the adjudicator evaluated the

individual's symptoms.  SSR 16-3p.  The factors that an ALJ should consider in evaluating the

claimant's subjective complaints, where they are not supported by objective medical evidence

alone, are:  (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity

of the symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness,

and side effects of any medications taken to alleviate the symptoms; (5) any treatment, other than

medication, that the claimant has received for relief of the symptoms; (6) any other measures

that the claimant employs to relieve the symptoms; and (7) other factors concerning the

claimant's functional limitations and restrictions as a result of the symptoms.  *See* 20 C.F.R.

§§ 404.1529(c)(3)(i)-(vii).

      **F.**    **Consideration of New Evidence**

      When a court is confronted with a case where the plaintiff has submitted supplemental

evidence to the court itself to support his or her claim, the court may remand based on that

evidence, provided the plaintiff shows good cause for the failure to have incorporated such

evidence into the record previously.  42 U.S.C. § 405(g); *see also Lisa v. Secretary of Health and

Human Services*, 940 F.2d 40, 43 (2d Cir. 1991); *Fortier v. Astrue*, No. 09cv0993 (RJS) (HBP),

2010 WL 1506549, at *20 (S.D.N.Y. Apr. 13, 2010) (adopting report and recommendation);

*Tirado v. Bowen*, 842 F.2d 595, 597 (2d Cir. 1988).  To justify remand, however, the court must

find that the supplemental evidence is "new" – in the sense that it is not merely duplicative of

evidence already in the record, *Tirado*, 842 F.2d at 597; *Harris-Batten v. Comm'r of Social Security*, No. 05cv7188, 2012 WL 414292, at *6 (S.D.N.Y. Feb. 9, 2012), and also that it is "material" – that is, relevant to the time period at issue, and probative, such that it is reasonably possible that such evidence would have influenced the Commissioner to decide the claim differently, *Tirado*, 842 F.2d at 597.

## II.    THE ALJ'S DECISION

On October 11, 2018, ALJ Barker issued his decision, finding that Plaintiff was not disabled under the Act and thus did not qualify for SSDI benefits.  (R. at 15-34.)  In rendering his decision, the ALJ applied the five-step sequential evaluation.

### A.    Steps One Through Three of the Sequential Evaluation

At Step One, the ALJ determined that Plaintiff met the insured-status requirements of the Act through September 30, 2016, and that she had not engaged in substantial gainful activity since before March 1, 2012, the alleged onset date of her disability.  (R. at 24.)

At Step Two, the ALJ found that Plaintiff had the "severe impairments" of lumbar degenerative disc disease, uterine fibroids, major depressive disorder, and panic disorder.  (*Id.*)

The ALJ found that Plaintiff's hypertension was not severe because her "blood pressure readings ha[d] been generally normal."  (*Id.*)  The ALJ further found that Plaintiff's asthma was not severe because she "had clear breath sounds and normal breath motions," as well as "clear lungs" over several evaluations, and because Plaintiff did not testify that she continued to experience "frequent breathing difficulties."  (*Id.*)  With regard to Plaintiff's testimony that she felt "severe pain throughout her body," the ALJ noted that Plaintiff indicated she had "rheumatic fever causing these symptoms."  (*Id.*, at 24-25.)  The ALJ continued that, "while the record refer[red] to diagnoses of rheumatoid arthritis from consultants, there [was] no evidence of

rheumatologic examination or blood testing showing positive rheumatoid factor," and additionally, that "Dr. Asad [had] noted no swelling or effusion, and no loss of motion in any joint to indicate an arthritic process."  (*Id.*, at 25.)[44]  Additionally, while Plaintiff complained of foot deformities, the ALJ found that "there [was] minimal objective examination showing a deformity of the foot."  (*Id.*)  Accordingly, he did "not find that these [were] severe medically determinable impairments."  (*Id.*)

As to Plaintiff's claim of fibromyalgia, the ALJ noted that, "while Dr. Henoch [had] described [Plaintiff as having] some distress due to anxiety and pain, as well as 'diffuse trigger points,'" it was "unclear that Dr. Henoch's 'trigger points' constitute[d] eleven of the eighteen specified tender points necessary to support a diagnosis of fibromyalgia under the 1998 [sic] American College of Rheumatology (ACR) criteria (SSR 12-2p)."[45]  (*Id.*)  In fact, the ALJ noted, Dr. Asad had indicated that Plaintiff "only exhibited six of the eighteen necessary tender points."  (*Id.*)

At Step Three, the ALJ reviewed these physical conditions and found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment.  (*Id.*, at 25.)

---

[44] As discussed further below (*see infra*, at Section III(B)(1)), the ALJ, in this section of his decision, appeared to conflate the distinct conditions of *rheumatic fever* and *rheumatoid arthritis*.  Rheumatic fever "is a disease that can affect the heart, joints, brain, and skin," and can develop "if strep throat and scarlet fever infections are not treated properly." https://www.cdc.gov/groupastrep/diseases-public/rheumatic-fever.html.  Rheumatoid arthritis, on the other hand, is an autoimmune disease where "the immune system mistakes the body's cells for foreign invaders and releases inflammatory chemicals that attack . . . the synovium, [which is] the tissue lining around a joint."  https://www.arthritis.org/diseases/rheumatoid-arthritis.

[45] *See* Discussion, *infra*, at Section III(B)(2).

The ALJ then separately evaluated Plaintiff's alleged mental impairments and concluded that they "did not meet or medically equal the criteria" of the Listings for mental disorders.  (*Id.*, at 26.)  In reaching this finding, the ALJ considered whether the "paragraph B" criteria were satisfied, which requires that a mental impairment "must result in at least one extreme or two marked limitations in a broad area of functioning, which are understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing themselves."  (*Id.*)  In understanding, remembering, or applying information, the ALJ found that Plaintiff had a "moderate limitation."  (*Id.*)  On this point, the ALJ noted that Plaintiff's "primary care provider [had] observed that [Plaintiff's] intellectual functioning appeared somewhat below average," and that Dr. Knox had indicated that Plaintiff had "some mild memory impairment, including recalling only one of three words after a five-minute delay."  (*Id.*)  On the other hand, the ALJ stated that Plaintiff's psychiatric records "repeatedly indicate[d]" that Plaintiff had "intact memory and fair insight," and that she had "engaged in English classes and was performing well in December 2016."  (*Id.*)  In interacting with others, the ALJ found that Plaintiff had a "mild limitation."  (*Id.*)  As to this criterion, the ALJ noted that, while Plaintiff testified that she had panic attacks when around other people, and while her psychiatric records indicated issues with constricted affect, she nevertheless had "fair eye contact and cooperative behavior," and, according to Dr. Knox, she had "a full range of affect with cooperative behavior, and related adequately."  (*Id.*)  With regard to concentrating, persisting, or maintaining pace, the ALJ found that Plaintiff had a "moderate limitation."  (*Id.*)  On this point, while the ALJ noted that Plaintiff complained of problems concentrating and Dr. Henoch had described her "as having moderately impaired attention," Dr. Knox had noted only "mild concentration issues" (indicating that Plaintiff "made only one error in completing

serial three subtractions and counting by twos") and that "mental health treatment records also characterize[d] [Plaintiff] as having sustained attention." (*Id.*) As for her ability to adapt or manage herself, the ALJ found that Plaintiff had a "moderate limitation." (*Id.*) On this criterion, the ALJ stated that, while "[m]ental health notes suggest[ed] some worsening of [Plaintiff's] symptoms in the setting of household stresses," and while Dr. Henoch had "indicated that [Plaintiff] became briefly hyperactive and agitated during [an] evaluation in February 2016," Plaintiff had "maintained fair judgment during mental health treatment" and had "described being able to manage her own money." (*Id.*) The ALJ concluded that, because Plaintiff's mental impairments did not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria were not satisfied. (*Id.*)

### B.   The ALJ's Assessment of Plaintiff's RFC

The ALJ then found that Plaintiff had the RFC "to perform light work as defined in 20 CFR 404.1567(b) except [that Plaintiff could] lift and carry, push, and pull twenty pounds occasionally and ten pounds frequently; [could] stand or walk for six hours of an eight-hour workday; and [could] sit for six hours in an eight-hour workday." (*Id.*, at 27.) He further determined that Plaintiff could "occasionally climb ramps and stairs, stoop, balance, kneel, crawl, and crouch," but never "climb ladders, ropes, or scaffolds," and that she could "understand, remember, and carry out simple tasks[,] but not at an assembly line rate; [could] make simple work-related decisions; and [could] have occasional[] changes in the work setting." (*Id.*) In making this RFC determination, the ALJ found that, although Plaintiff had medically determinable impairments that "could reasonably be expected to cause [her] alleged symptoms," her "statements concerning the intensity, persistence and limiting effects of these symptoms

[were] not entirely consistent with the medical evidence and other evidence in the record."  (*Id.*, at 28.)

### 1.     Findings Regarding Plaintiff's Physical Impairments

Regarding Plaintiff's degenerative disc disease, the ALJ acknowledged that the medical records suggested the onset of chronic back pain in October 2015, that imaging of Plaintiff's spine in November 2015 revealed a bulging disc, and that Dr. Henoch's notes did "at times indicate evidence of back pain."  (*Id.*, at 28.)  The ALJ also noted, however, that Dr. Henoch's notes generally indicated "normal motor and sensory functioning," and that Plaintiff exhibited "no tenderness on an evaluation completed in October 2016."  (*Id.*)  Additionally, the ALJ observed that Dr. Asad had noted "no evidence of limited spinal range of motion," and had described Plaintiff as having an "unassisted gait, the ability to perform a full squat, no evident muscle weakness, and no sensory deficits."  (*Id.*)  The ALJ stated that, "because there [was] some evidence of degenerative disc disease and spinal tenderness[,] but without evidence of chronic neurologic deficits or impaired gait," he found Plaintiff's allegations regarding her back pain "only somewhat supported."  (*Id.*)

As to Plaintiff's fibroids, the ALJ noted that, while the record indicated the presence of uterine fibroids, as well as abdominal pain and tenderness, Dr. Henoch's notes "otherwise generally [did] not identify significant suprapubic tenderness," and that Dr. Asad had found Plaintiff to have "no abdominal tenderness or masses."  (*Id.*)  Additionally, the ALJ noted that there was "little additional evidence of further gynecological examination following [Plaintiff's] hospitalization in July 2015."  (*Id.*)  Therefore, he found that "the evidence only somewhat support[ed] allegations of limitation due to [Plaintiff's] fibroids," and concluded that Plaintiff

could "perform exertion at a light level, and [could] occasionally perform postural tasks such as stooping, crawling, and climbing." (*Id.*)

### 2.      Findings Regarding Plaintiff's Mental Impairments

With regard to Plaintiff's mental impairments, the ALJ noted that "the evidence indicate[d] complaints of dysphoria, crying spells, social withdrawal, panic attacks, and concentration problems," and that the medical record further indicated that Plaintiff's symptoms were "exacerbated by home stressors such as mentally ill children and deaths in the family." (*Id.*, at 29.)  The ALJ acknowledged that Plaintiff's treatment notes suggested "recurrent depression and anxiety" and that Dr. Henoch had indicated that Plaintiff had impaired attention. (*Id.*)  The ALJ also noted that Dr. Knox had indicated that Plaintiff had "some problems with attention and concentration," but had characterized those issues as "only mild," and had also indicated that Plaintiff "related adequately and displayed a full range of affect despite being dysphoric during her examination." (*Id.*)  Additionally, the ALJ noted that Plaintiff's treatment records indicated that she "sustained memory and attention normally," "remained cooperative and sustained fair to average eye contact despite her depression and anxiety," and "maintained fair judgment despite her anxiety." (*Id.*)  The ALJ concluded that, "[b]ecause the evidence indicate[d] persistent depression and anxiety with some impairment of concentration, but with generally cooperative behavior and no more than mild cognitive impairment on examination," Plaintiff's allegations regarding her mental impairments were "partially supported." (*Id.*)

### 3.      Findings Regarding Plaintiff's Subjective Complaints

The ALJ noted that, in her application for benefits, Plaintiff had "described a number of reduced activities of daily living consistent with her allegations." (*Id.*, at 29.)  The ALJ also noted that Plaintiff had told Dr. Knox that she needed assistance with laundry and cleaning and

that she usually had her son shop with her, but the ALJ then found that "the medical record contain[ed] minimal objective evidence consistent with the pain described." (*Id.*) Further, the ALJ noted that Plaintiff had told Dr. Asad that she cooked several times a week, and did laundry and went shopping on a weekly basis. (*Id.*) The ALJ stated that some of Plaintiff's activities of daily living were "inconsistent with the alleged mental limitations," citing, for example, the fact that Plaintiff reportedly "[took] the bus as her primary mode of transportation," and that she was engaged in English classes and was doing well "within several months of her date last insured," which the ALJ concluded weighed "against significant problems with learning new tasks." (*Id.*) The ALJ also found that, while there was evidence that Plaintiff had received "consistent treatment for her mental health impairments, including monthly psychiatry appointments," "there [was] no evidence of pronounced exacerbations leading to suicidal thinking or emergency evaluations." (*Id.*)

As for Plaintiff's particular complaints of pain, the ALJ noted that the record indicated that, despite an "emergency evaluation in January 2015" for her uterine fibroids, she had received only "limited treatment" for that condition. (*Id.*, at 29-30.) The ALJ also noted that Plaintiff had also received "limited specific orthopedic or neurological treatment for her spinal condition." (*Id.*, at 30.)

### 4.   <u>Weighing of the Medical Opinion Evidence</u>

As summarized below, the ALJ did not accord controlling weight to either of the treating-physician opinions contained in the Record – *i.e.*, the opinion of Plaintiff's primary care physician, Dr. Henoch, or the opinion of Plaintiff's treating psychiatrist, Dr. Ibanez. Rather, the ALJ assigned only "little" weight to Dr. Henoch's opinion, and only "partial" weight to Dr. Ibanez's opinion. Nor, in formulating Plaintiffs' RFC, does it appear that the ALJ primarily

relied on the opinion of either of the consultative examiners, as he assigned the opinion of the

internal medicine consultant (Dr. Asad) only "some" weight, and the opinion of the consulting

psychologist (Dr. Knox) only "partial" weight.  Overall, as set out below, it appears the ALJ

relied most heavily on the opinion expressed by the non-examining reviewer, Dr. Lieber-Diaz,

finding that that opinion should be given "considerable" weight.

### a. <u>Dr. Henoch</u>

Although the ALJ recognized that Dr. Henoch had opined that Plaintiff was not able to

perform any work and was permanently disabled, the ALJ noted that the question of whether a

claimant can work is reserved to the Commissioner.  (*Id.*, at 30.)  Further, the ALJ noted that

"the only examination findings that Dr. Henoch offer[ed] in support of his opinion . . . [were]

observations of 'moderate to marked distress,' abdominal tenderness, and diffuse 'trigger

points,'" and that Dr. Henoch did not include, in his report, any "observations of impaired

mobility or reduced strength."  (*Id.*)  The ALJ also observed that, while Dr. Henoch's notes

"suggest[ed] the existence of a spinal condition," an examination in October 2016 showed "full

range of motion without apparent radicular pain and without loss of range of motion or

paraspinous tenderness," and the ALJ determined that these clinical findings were "inconsistent

with the degree of limitation [Dr. Henoch] describe[d] in his opinion."  (*Id.*)  The ALJ

additionally found that Dr. Henoch's opinion as to the extent of Plaintiff's physical limitations

was inconsistent with the findings of Dr. Asad Plaintiff had a "normal gait, full strength, full

range of motion, and no apparent joint abnormalities."  (*Id.*)  Finally, the ALJ found that

Dr. Henoch's opinion that Plaintiff could not interact with the public or supervisors was

inconsistent with Plaintiff's mental health records, which, according the ALJ, indicated some

mental limitations, but "also describe[d] cooperative behavior and fair eye contact." (*Id.*)  For these stated reasons, the ALJ assigned "little weight" to Dr. Henoch's opinion.  (*Id.*)

**b.**   **Dr. Ibanez**

Moving on to Dr. Ibanez, the ALJ noted that Dr. Ibanez's opinion that Plaintiff could not perform detailed or complex work was "generally consistent with [the results of] Dr. Knox's examination[,] indicating impairment of memory, including diminished delayed recall." (*Id.*, at 31.)  Nonetheless, the ALJ noted that Dr. Knox had also observed that Plaintiff "related adequately and had a full range of affect during the examination," which the ALJ found was inconsistent with Dr. Ibanez's opinion that Plaintiff "[could not] interact with others." (*Id.*)  The ALJ also noted that Dr. Ibanez's own treatment notes indicated "cooperative behavior with fair eye contact," and that other treatment notes indicated that Plaintiff was "managing grief from a death in her family well," which, according to the ALJ, was "inconsistent with [Dr. Ibanez's] opinion that [Plaintiff] [could not] maintain behavior in a work environment and would miss work repeatedly." (*Id.*)  On this stated basis, the ALJ assigned Dr. Ibanez's opinion "partial weight." (*Id.*)

**c.**   **Dr. Asad**

The ALJ found that Dr. Asad's opinion that Plaintiff would need to avoid respiratory irritants due to her asthma was inconsistent with the medical evidence, which, according to the ALJ, "[did] not include evidence of breathing abnormalities to suggest severe asthma consistent with this opinion." (*Id.*, at 30.)  Moreover, the ALJ found that Dr. Asad's opinion that Plaintiff had limitations due to her fibromyalgia was "inconsistent with [her] examination showing six of eighteen possible tender points" – results that the ALJ found were not even sufficient to support a diagnosis of fibromyalgia.  (*Id.*)  The ALJ did, however, accept Dr. Asad's opinion that

plaintiff's "exertional limitations [were] no more than mild" – in this regard, the ALJ noted that,

even though Dr. Henoch's records contained some evidence of sprains and disc bulges

"consistent with some exertional limitations," Dr. Asad's opinion regarding the extent of such

limitations was supported by her examination of Plaintiff, which revealed normal gait and full

strength.  (*Id.*)  Overall, the ALJ concluded that, "because Dr. Asad's opinion of the sources of

[Plaintiff's] limitations [were] not fully consistent with the record, but [her] examination

generally support[ed] the extent of limitation [s]he describe[d]," her opinion was entitled to

"some weight."  (*Id.*, at 31.)

### d.   Dr. Knox

The ALJ found that Dr. Knox's opinion that Plaintiff had "mild limitations in attention

and moderate limitations in performing complex tasks" was supported by her observations of

"diminished delayed recall and one error while completing serial threes."  (*Id.*, at 31.)  The ALJ

further found that Dr. Knox's opinion that Plaintiff had no significant limitation in relating with

others was supported by treatment notes "describing the [Plaintiff] as cooperative and having fair

eye contact despite anxiety in November 2014."  (*Id.*)  On the other hand, the ALJ found that

Dr. Knox's opinion that Plaintiff had "moderate to marked limitations in completing simple tasks

[stood] in apparent contradiction" to her opinion that Plaintiff ha[d] "only moderate limitation in

completing complex tasks," and also contradict[ed] Dr. Henoch's treatment notes, which

indicated "normal mood and intact judgment."  (*Id.*)  For these reasons, the ALJ afforded

Dr. Knox's opinion "partial weight."  (*Id.*)

### e.   Dr. Lieber-Diaz

As set out above, Dr. Lieber-Diaz opined that Plaintiff could "sustain simple work with

moderate limitations in remembering and carrying out detailed instructions, sustaining pace

during a workweek, and responding to changes in the work setting." (*Id.*, at 32.)  While

recognizing that Dr. Lieber-Diaz had "never directly evaluated the [Plaintiff]," the ALJ found

this opinion supported by the results of Dr. Knox's examination; specifically, according to the

ALJ, Dr. Knox's examination had indicated "diminished delayed recall[] of only one of three

objects after five minutes," which the ALJ found "generally consistent" with a conclusion that

Plaintiff could "perform simple but not detailed tasks." (*Id.*)  The ALJ also found

Dr. Lieber-Diaz's opinion supported by the notes of Dr. Henoch that, according to the ALJ,

indicated "some impairment of attention with brief hyperactivity, consistent with reduced ability

to sustain work pace." (*Id.*)  In all, the ALJ assigned "considerable weight" to Dr. Lieber-Diaz's

opinion. (*Id.*)

### C. Steps Four and Five of the Sequential Evaluation

At Step Four, the ALJ found that, through the date last insured, Plaintiff had been unable

to perform any past relevant work, as her past relevant work had "involved the performance of

semiskilled tasks, exceeding the residual functional capacity for simple tasks." (*Id.*, at 32.)

Finally, at Step Five, the ALJ found that, through the date last insured, and "considering

[Plaintiff's] age, education, work experience, and [RFC], there were jobs that existed in

significant numbers in the national economy that [Plaintiff] could have performed." (*Id.*, at 33.)

## III. REVIEW OF THE ALJ'S DECISION

On Plaintiff's appeal, the Court is tasked with determining whether the ALJ's decision

"affords an adequate basis for meaningful judicial review, applies the proper legal standards, and

is supported by substantial evidence." *Cichocki v. Astrue*, 729 F.3d 172 (2d Cir. 2013).  As the

ALJ used the applicable five-step evaluation in analyzing Plaintiff's claim, the initial question

before this Court is whether, in evaluating Plaintiff's claim under this accepted protocol, the ALJ

made any errors of law that might have affected the disposition of the claim.  If the ALJ did not

commit legal error, then the Court must go on to determine whether the ALJ's determination that

Plaintiff was not disabled was supported by substantial evidence.

Plaintiff, proceeding *pro se*, has not set out specific reasons for her challenge to the

ALJ's decision, although, based on her submissions, she appears to rely, at least in part, on

newly submitted evidence.  For his part, the Commissioner seeks to affirm the ALJ's

determination on the general ground that it is purportedly supported by substantial evidence.

(*See generally* Def. Mem.)  Upon its own, independent review of the ALJ's decision, the Court

finds that, while Plaintiff's newly submitted evidence would not independently justify remand,

the ALJ committed certain errors of law that make remand appropriate here, even before the

"substantial evidence" inquiry may be reached.

### A.    The Additional Evidence Submitted by Plaintiff to This Court Does Not, in Itself, Warrant Remand.

As set out above (*see* Discussion, *supra*, at Section I(F)), for the Court to consider the

evidence submitted by Plaintiff to the Court, outside the Record and after the commencement of

this action, the Court would have to find (1) that this supplemental evidence is new; and (2) that

it is "material," in that it is both probative and relevant to the time period at issue.  *Tirado,* 842

F.2d at 597.

In this case, none of the supplemental evidence submitted by Plaintiff to the Court meets

these requirements.  While the hospitalization records that Plaintiff initially submitted in

opposition to Defendant's motion (*see* Dkt. 25) may be considered "new," as they were not

before the ALJ, those records cannot be found "material."  Rather, as Defendant notes, those

records relate to Plaintiff's health in August 2020, nearly two years after the ALJ issued his

decision, and nearly four years after Plaintiff's date last insured.  (Def. Reply, at 4; *see generally*

Dkt. 25.)  Additionally, those records appear to reflect a discrete episode that Plaintiff's treaters

attributed to hyponatremia (Dkt. 25, at 15), a condition that Plaintiff does not appear to have had

within the relevant time period, as it is nowhere mentioned in the records from that period.  As

for the November 2020 letter from Rodriguez that Plaintiff submitted on sur-reply (Dkt. 29), that

letter merely confirms, with respect to the relevant period, that Plaintiff had undergone mental-

health therapy, adding nothing "new" to the existing Record, from which that therapy is already

evident.

 Accordingly, the medical records submitted by Plaintiff to the Court should not be added

to the Record, and remand for their consideration by the ALJ would not be warranted.

### B.   Remand Is Required Because of the ALJ's Failure To Develop the Record.

 As also set out above (*see* Discussion, *supra*, at Section I(C)), the Court must, as a

threshold matter, independently consider the question of whether the ALJ failed to satisfy his

duty to develop the Record.  *See Castillo*, 2019 WL 642765, at *7.  In this case, the ALJ made

certain determinations – particularly with respect to Plaintiff's diagnoses of rheumatic fever,

rheumatoid arthritis, and fibromyalgia – that could not have reasonably made without first

seeking to fill in gaps or clarify inconsistencies in the Record.

### 1.   Failure To Evaluate Rheumatic Fever and Rheumatoid Arthritis as Separate Conditions, and Failure To Develop the Record as to the Latter

 Plaintiff's medical records indicate that she repeatedly informed medical professionals

that, as a young child, she had been diagnosed with rheumatic fever (*see* R., at 384, 392, 827), a

disease that, among other things, can cause damage to the heart and joints, as noted above (*see*

*supra*, at n.44).  It further appears from the Record that Plaintiff may, in fact, have suffered at

least heart symptoms traceable to this disease (*see, e.g.*, R. at 384 (recording, *inter alia*, that

Plaintiff had a heart murmur); *id.,* at 79 (Plaintiff testifying to having a heart murmur and

tachycardia); *id.* at 874 (reflecting the Plaintiff exhibited ischemia, upon a stress test)),[46] and that

she continued to be treated for the disease with regular penicillin injections (*see id.*, at 390

(Dr. Asad noting that Plaintiff received "Penicillin injections once a month for rheumatic fever);

*see also id.*, at 71 (Plaintiff testifying at the Hearing that she received injections for rheumatic

fever)).[47]

Separately, the Record contains at least some indications that Plaintiff may have also

suffered from rheumatoid arthritis, a different condition.  (*See supra*, at n.44.)  Certainly,

Dr. Henoch reported "rheumatoid arthritis" as one of Plaintiff's diagnoses (*see id.*, at 569), and,

in his narrative evaluation of Plaintiff's overall condition, he wrote that Plaintiff; "continue[d] to

have pain because of rheumatoid arthritis and fibromyalgia . . ." (*id.*, at 567.)  The Record also

reflects that Plaintiff was prescribed Meloxicam and Indomethacin, which are both used to treat

types of arthritis, including rheumatoid arthritis.  (*See supra*, at nn.6, 13.)  More importantly

(given that, as the ALJ correctly observed, Dr. Henoch's underlying treatment records do not

themselves contain findings specific to rheumatoid arthritis), Dr. Henoch's report noted that

Plaintiff had been seen in 2014 by a rheumatologist, Dr. Patel, who had assessed Plaintiff as

having rheumatoid arthritis, as well as Raynaud's syndrome (*id.*, at 569), which, as noted above,

is often associated with rheumatoid arthritis (*see supra*, at n.19).  The Record, however, does not

---

[46] Heart problems such as these can be caused by rheumatic fever.  *See* https://www.cdc.gov/groupastrep/diseases-public/rheumatic-fever.html.  "If rheumatic fever is not treated promptly, long-term heart damage (called rheumatic heart disease) may occur," and can cause heart murmurs, an enlarged heart, and a fast heartbeat.  *Id.*

[47] People who have been diagnosed with rheumatic fever "may need antibiotic prophylaxis over a period of many years," which can include "daily antibiotics by mouth or a shot into the muscle every few weeks."  https://www.cdc.gov/groupastrep/diseases-public/rheumatic-fever.html.

contain Dr. Patel's records, and thus it is unclear what evaluations or tests she may have performed to support her reported assessment.

At the Hearing, the ALJ asked Plaintiff's counsel if there was "any documentation in the record of rheumatoid arthritis" "[m]eaning, like, laboratory findings," and counsel – seemingly focusing on Plaintiff's history of *rheumatic fever* – indicated that he "wouldn't expect there to be." (*Id.*, at 82 (counsel stating that "this is a childhood illness that she's more or less recovered from, but it can cause lifelong consequences, such as her heart problems").)  The ALJ, however, had an independent obligation to develop the Record, and, in the face of the notation in Dr. Henoch's report regarding Plaintiff's consultation with a rheumatologist, who may well have made findings relevant to a diagnosis of rheumatoid arthritis, the ALJ should have sought to obtain that specialist's records, before simply assuming that no such findings existed.  *See Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) ("[e]ven when a claimant is represented by counsel, it is the well-established rule in our circuit 'that the social security ALJ, unlike a judge in trial, must on behalf of all claimants . . . affirmatively develop the record'" (quoting *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 508-09 (2d Cir. 2009))).

In his decision, the ALJ doubly erred in his evaluation of Plaintiff's potential impairments of rheumatic fever and rheumatoid arthritis.  First, as noted above, he conflated them, moving directly from one to the other, without properly addressing them as distinct conditions.  Specifically, he wrote:

> [Plaintiff] told consultative examiner Syeda Asad, M.D. that she has had rheumatoid [sic] fever since age 7.  [Plaintiff] has continued to complain of rheumatic fever to her psychiatric providers (Exhibit B9F/ 59).  However, while the record refers to diagnoses of rheumatoid arthritis from consultants, there is no evidence of rheumatologic examination or blood testing showing positive rheumatoid factor (Exhibit 11F/ 3).  Additionally,

> Dr. Asad noted no joint swelling or effusion, and no loss of motion
> in any joint to indicate an arthritic process.

(R., at 25.)  Second, although the ALJ actually noted the "diagnoses of rheumatoid arthritis from

consultants" (presumably referring, at least in part to the diagnosis of Dr. Patel), he did not

provide any explanation for his apparent failure to seek Dr. Patel's records, so as to ascertain

whether those records in fact revealed a "positive rheumatoid factor" or other clinical evidence

of the condition.  On this point, the Court also notes that, in any event, it is not necessary under

SSA guidelines for a claimant to have positive rheumatoid factor, in order to have the medically

determinable condition of rheumatoid arthritis.[48]

At a minimum, the ALJ should have conducted separate evaluations as to whether

Plaintiff suffered from the medically determinable impairments of rheumatic fever and

rheumatoid arthritis.  Further, as to the latter condition, the ALJ should have sought to develop

the Record by making reasonable efforts to obtain the records of Dr. Patel.  His failure to do so

warrants remand.

### 2.    Failure To Seek Clarification of the Bases For Plaintiff's Diagnosis of Fibromyalgia

Plaintiff also repeatedly reported having pain from fibromyalgia, and both Dr. Henoch's

and Dr. Asad's reports indicate that she had this condition.  (R. at 567 (Dr. Henoch reporting that

Plaintiff had "fibromyalgia affecting her whole body"); 569 (indicating fibromyalgia diagnosis));

392 (Dr. Asad report (listing fibromyalgia as one of Plaintiff's diagnoses).)  The ALJ noted at the

---

[48] *See* https://www.ssa.gov/disability/professionals/bluebook/14.00-Immune-Adult.htm#14_09, at § (D)(6)(d) (noting that "[g]enerally, but not always, the diagnosis of inflammatory arthritis is based on the clinical features and serologic findings described in the most recent edition of the Primer on the Rheumatic Diseases published by the Arthritis Foundation"); *see also* https://medlineplus.gov/lab-tests/rheumatoid-factor-rf-test/ (indicating that approximately 20 percent of those diagnosed with rheumatoid arthritis do not demonstrate a positive rheumatoid factor).

Hearing, however, that fibromyalgia could not be found to be a medically determinable impairment, absent specific medical evidence (*see id.*, at 73-74), and, ultimately, the ALJ found that the medical record lacked such evidence (*id.* at 25).

Indeed, according to the SSA, a claimant may not be considered to have the medically determinable impairment of fibromyalgia unless certain diagnostic criteria are satisfied through evidence provided by a licensed physician.  (*See* SSR 12-2p (providing guidance on how to establish "that a person has a medically determinable impairment ("MDI") of fibromyalgia ("FM"), and how [to] evaluate FM in disability claims . . . .").)  It is sufficient, though, for the presented evidence to satisfy either one of two alternative sets of criteria – either those set out in the 1990 American College of Rheumatology ("ACR") Criteria for the condition, or those set out in the later-issued 2010 ACR Criteria.

Both of these sets of criteria require evidence of a history of widespread pain that has persisted for at least three months, and evidence that other disorders, which could cause the individual's symptoms, have been excluded.  (*See id.*)  The difference between the 1990 and 2010 ACR Criteria is that the former additionally requires evidence of "at least 11 positive tender points on physical examination," whereas the latter alternatively requires evidence that the claimant has had "repeated manifestations of six or more FM symptoms, signs, or co-occurring conditions, especially manifestations of fatigue, cognitive or memory problems, waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome."  (*See id.*)

Here, the medical Record shows that Plaintiff repeatedly complained of pain due to fibromyalgia (*see, e.g.,* R., at 384, 389, 799), that Dr. Henoch prescribed Plaintiff medication for pain (*see id.*, at 790-94), and that Dr. Ibanez not only prescribed her Cymbalta (which, apart from treating depression, may also be used to treat pain due to fibromyalgia (*see supra*, at n.23)),

but increased the dose of that medication when Plaintiff reported, in April 2015, that she had

been having more pain "all over" (R., at 523).  As to the 1990 ACR Criteria, though, (mistakenly

cited by the ALJ as the "1998" ACR Criteria (*see* R. at 25), the ALJ found that neither of the

doctors who had assessed Plaintiff with fibromyalgia had identified a sufficient number of

"trigger points" for pain (*see id.* (finding that "the evidence [did] not establish fibromyalgia as a

medically determinable impairment," where, *inter alia*, it was "unclear that Dr. Henoch's 'trigger

points' constitute[d] eleven of the eighteen specified tender points necessary to support a

diagnosis of fibromyalgia, and where Dr. Asad had indicated that Plaintiff "had only exhibited

six of the eighteen necessary tender points")).  As to the 2010 ACR, the ALJ found that the

medical record "[did] not indicate a series of six consistent additional symptoms or co-existing

impairments consistent with [those criteria].  (*Id*.)

       While the ALJ was correct that the diagnostic criteria must be met before a claimant may

be found to have fibromyalgia, the Court finds that the Record was not sufficiently developed in

this case for the ALJ to have rejected the diagnosis without first seeking clarification from at

least Dr. Henoch, and possibly also from Dr. Asad.  First, as to the 1990 ACR Criteria,

Dr. Henoch noted in his report that Plaintiff had "painful trigger points over the entire spine as

well as the shoulders[,] hips[,] arms[,] and legs."  (*Id*., at 568.)  The ALJ, however, stated that

Dr. Henoch's report was "unclear" as to whether he had identified a sufficient number of trigger

points for pain.  (*See id.*, at 25.)  If the ALJ believed that Dr. Henoch's report was insufficiently

clear on this point, then the ALJ should have contacted Dr. Henoch, to seek an explanation as to

whether a sufficient number of trigger-points had been identified through examination.  Second,

even if neither Dr. Henoch nor Dr. Asad could supply evidence of a sufficient number of trigger

points to satisfy the 1990 ACR Criteria for fibromyalgia, there remained the possibility that

Plaintiff could have met the alternative 2010 ACR Criteria, and the ALJ's determination that Plaintiff had not exhibited the necessary "additional symptoms or co-existing impairments" (*id.*) was entirely conclusory.  At that stage in his analysis, the ALJ made no mention of the fact that Plaintiff had long been treated for depression and anxiety (*see, e.g.*, *id.*, at 463, 471), and that, according to Dr. Ibanez, Plaintiff had exhibited "poor concentration, poor memory, poor sleep, [and] fatigue" (*id.*, at 564).  All of these were types of co-occurring conditions that, if supported by evidence from a licensed physician, could have permitted a finding that fibromyalgia was a medically determinable condition, and potentially a severe one.

It is true that an ALJ "is not bound by a treating physician's opinion if that opinion is . . . not supported by the physician's treatment records," *Villanueva v. Barnhart*, No. 03cv9021 (JGK), 2005 WL 22846, at *12 (S.D.N.Y. Jan. 3, 2005), and the Court notes that the ALJ, in this case, apparently believed that the diagnosis of fibromyalgia contained in Dr. Henoch's report was not supported by, or was inconsistent with, his underlying records (*see* R., at 25 (stating that the treatment notes did not "offer a diagnosis of or treatment for fibromyalgia")).  Yet, especially where the ALJ finds a treating physician's opinion to be "unclear" or unduly vague on a critical point, development of the record is important, both to gain a better understanding of the treater's opinion and to enable the ALJ to reconcile any perceived inconsistencies in the record.  *See, e.g.*, *Gabrielsen v. Colvin*, No. 12cv5694 (KMK) (PED), 2015 WL 4597548, at *6 (S.D.N.Y. Jul. 30, 2015) (noting that re-contacting a treater may be required to "address gaps or inconsistencies in the record"); *Cammy v. Colvin*, No. 12-CV-5810 (KAM), 2015 WL 6029187, at *16 (E.D.N.Y. Oct. 15, 2015) (remanding because ALJ failed to seek additional information from treating physicians to clarify inconsistencies in the record).  It was improper for the ALJ to have wholly rejected Plaintiff's complaints of fibromyalgia and its potentially debilitating symptoms, without,

at a minimum, seeking to ascertain the basis for Dr. Henoch's diagnosis.  Without doing so, the

ALJ could not have assured himself that Plaintiff did not, in fact, suffer from this condition.  This

error by the ALJ also warrants remand.

###### C.    Other Errors That Should Be Addressed Upon Remand

Upon a developed Record, the ALJ should also rectify other errors in his analysis –

particularly, his improper weighing of the medical opinion evidence, his unsupported assessment

of the extent of Plaintiff's functional limitations, and his failure to consider Plaintiff's subjective

complaints regarding the side effects of her medications.

###### 1.    Failure To Comply With the Treating Physician Rule

In the decision currently under review, the ALJ erred in how he weighed the opinion

evidence in the Record.  As set out above, under the treating physician rule, the medical opinion

of a treating source as to the nature and severity of the claimant's impairments should be given

controlling weight, absent "good reasons" for assigning it lesser weight.  20 C.F.R.

§ 404.1527(c)(2).  Moreover, even where an ALJ determines that a treating physician's opinion

is not entitled to "controlling" weight, the ALJ should generally give that opinion greater weight

than the opinions of consulting examiners, and certainly greater weight than the opinions of any

non-examining sources.  (*See* Discussion, *supra*, at Section I(D).)

In this case, despite Plaintiff's having had a significant longitudinal treatment history

with them, the ALJ assigned the opinions of Plaintiff's treating physicians, Dr. Henoch and

Dr. Ibanez, only "little" and "partial" weight, respectively.  (*See* R., at 30, 31.)  Moreover, he

weighed those opinions no more heavily than the opinions of the consulting examiners, Dr. Asad

and Dr. Knox, who each saw Plaintiff on only a single occasion.  (*See id.*, at 31 (assigning

Dr. Asad's opinion "some" weight, and Dr. Knox's opinion "partial weight").)  Even more

strikingly, the ALJ assigned the *greatest* weight to the opinion of *the one source who never examined Plaintiff* – the state agency reviewer, Dr. Lieber-Diaz.  (*See* R., at 32 (assigning this opinion "considerable" weight).)  On its face, this appears problematic, *see, e.g.*, *Oliveras ex rel. Gonzalez v. Astrue*, No. 07cv2841 (RMB) (JCF), 2008 WL 2262618, at *7 (S.D.N.Y. May 30, 2008) ("The opinion of a consulting doctor who simply reviewed the medical data is not an adequate substitute for the opinion of a physician who has been able to observe the claimant over a period of time."), *report and recommendation adopted*, 2008 WL 2540816 (June 25, 2008), and the Court finds that the ALJ did not provide the "good reasons" that would have been necessary to justify his elevating the opinion of a non-examiner well above the opinions of Plaintiff's long-standing treaters.

Aside from noting that the ultimate issue of disability is reserved to the Commissioner (*see* R., at 30), the ALJ's stated reasons for significantly discounting Dr. Henoch's lengthy opinion were:  (1) that "the only examination findings that Dr. Henoch offer[ed] in support of his opinion as to [Plaintiff's] physical functioning [were] observations of 'moderate to marked distress,' abdominal tenderness, and diffuse 'trigger points'"; (2) that Dr. Henoch's treatment notes "did not include observations of impaired mobility or reduced strength," and that, although his notes "suggest[ed] the existence of a spinal condition," one particular examination, in October 2016, showed Plaintiff to have "full range of motion without apparent radicular pain"; (3) that Dr. Henoch's functional assessments were inconsistent with Dr. Asad's findings that Plaintiff had a "normal gait, full strength, full range of motion, and no apparent joint abnormalities"; and (4) that Dr. Henoch's opinion that Plaintiff could not interact with the public or supervisors was inconsistent with her mental health records, which, despite showing "chronic

depression and anxiety," also "describe[d] cooperative behavior and fair eye contact." (*Id.*, at 30.)

At the outset, this Court notes that it is plainly incorrect to say that the only evidence Dr. Henoch offered in support of his opinion were observations of moderate-to-marked distress, abdominal tenderness, and diffuse trigger points. In his report (which, as noted above, was titled "Comprehensive Evaluation"), Dr. Henoch noted that Plaintiff had pain "because of rheumatoid arthritis and fibromyalgia affecting her whole body." (*Id.*, at 567.) He continued that Plaintiff had "soreness over her entire body," and had "painful trigger points over the entire spine as well as the shoulders[,] hips[,] arms[,] and legs." (*Id.*, at 567-68.) Dr. Henoch explained that Plaintiff's activities were limited due to her "chronic recurring pain and trigger point discomfort." (*Id.*, at 570.) Additionally, the Record contains treatment notes from nearly two dozen visits with Dr. Henoch, and, while it is true that Dr. Henoch often noted, at those visits, that Plaintiff had full range of motion (*see, e.g., id.*, at 758-69), he nevertheless also recorded that Plaintiff had sprains and bulging discs, and he continually prescribed her pain medication (*see, e.g., id.*, at 801, 810-14).

As for Dr. Henoch's treatment note from October 2016, this post-dated the period under review, and therefore has little relevance. Further, Dr. Henoch saw Plaintiff approximately two dozen times between March 2012 and September 2016, and the ALJ was not entitled to rely selectively on only those treatment notes that supported his conclusion. *See Lewis v. Astrue*, No. 11cv7538 (JPO), 2013 WL 5834466, at *29 (Oct. 30, 2013) (an ALJ may not "cherry-pick which documents and evidence he looks at, ignoring some and using others."). Finally, the fact that a treating physician's assessment may conflict with that of a consulting examiner is not a sufficient basis to discount the weight assigned to the treating physician's opinion. *See*

*Medina v. Comm'r of Soc. Sec.*, No. 13cv2323 (KAM), 2016 WL 4402010, at *18 (E.D.N.Y. Aug. 18, 2016) ("The Second Circuit has repeatedly determined that when there are conflicts between the treating and consulting sources, the 'consulting physician's opinions or report should be given limited weight'" (citing *Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990))).

Accordingly, the ALJ did not provide "good reasons" for assigning less than controlling weight to Dr. Henoch's assessment, or at least greater weight than that of the consulting and non-examining sources.

The same is true with respect to Dr. Ibanez's opinion. The ALJ's stated reasons for discounting the opinion of Plaintiff's psychiatric treater were that (1) Dr Ibanez's opinion that Plaintiff could not interact with others was undermined by (a) the observations of Dr. Knox, the consulting examiner, that Plaintiff "related adequately and had a full range of affect during examination," and (b) Dr. Ibanez's "own treatment notes," which "indicate[d] cooperative behavior with fair eye contact"; and (2) Dr. Ibanez's opinion that Plaintiff could not "maintain behavior in a work environment and would miss work repeatedly" was inconsistent with treatment notes indicating that Plaintiff "was managing grief from a death in her family well." (R., at 31.)

Again, a finding that the opinion of a treating physician is inconsistent with the opinion of a consulting examiner is an insufficient reason to discount the opinion of the treater. Moreover, singling out the fact that Plaintiff cooperated and had "fair eye contact" with her therapist, with whom she had presumably developed trust in a long-standing mental-health treatment relationship, is hardly determinative of whether Plaintiff would have been able to interact well with others in the workplace. Similarly, it is difficult even to understand why Plaintiff's ability to cope with the death of a family member would demonstrate that, contrary to

her psychiatrist's assessment, she would be able to "maintain behavior in a work environment," and not have excessive absences from work.

Under these circumstances, the ALJ, upon remand, should re-weigh the opinion evidence, in accordance with the requirements of the treating physician rule.

## 2. Substitution of the ALJ's Lay Opinion For the Opinions of Medical Professionals

Upon remand, the ALJ should also undertake to ensure that every functional limitation contained in his RFC determination is supported by the medical record. In his current decision, the ALJ repeatedly ignored or substantially diverged from the functional assessments that had been provided by both Plaintiff's treaters and the consulting examiners, and, on some points, he assessed functional capacities that were never addressed by any medical source. This represented an improper substitution of the ALJ's lay opinion for that of the medical professionals. *See Merriman v. Comm'r of Soc. Sec.*, No. 14cv3510 (PGG) (HBP), 2015 WL 5472934, at *18 (S.D.N.Y. Sept. 17, 2015) ("Because an RFC determination is a medical determination, an ALJ who makes an RFC determination in the absence of supporting expert medical opinion has improperly substituted his own opinion for that of a physician, and has committed legal error." (citation omitted)).

With respect to Plaintiff's exertional limitations, the ALJ found, as stated above, that Plaintiff had the RFC "to perform light work as defined in 20 CFR 404.1567(b) except [that Plaintiff could] lift and carry, push, and pull twenty pounds occasionally and ten pounds frequently; [could] stand or walk for six hours of an eight-hour workday; and [could] sit for six hours in an eight-hour workday." (R. at 27.) He further determined that Plaintiff could "occasionally climb ramps and stairs, stoop, balance, kneel, crawl, and crouch," but never "climb ladders, ropes, or scaffolds," and that she could "understand, remember, and carry out simple

66

tasks but not at an assembly line rate; [could] make simple work-related decisions; and [could] have occasionally changes in the work setting."  (*Id.*)

There is, however, absolutely no support in the record for the ALJ's finding that Plaintiff could "lift and carry, push and pull twenty pounds occasionally and ten pounds frequently." Dr. Henoch, in fact, opined that Plaintiff was *completely unable* to lift, pull, or push "because of her fibromyalgia and rheumatoid pain" (*id.*, at 570), and Dr. Asad opined that Plaintiff had "mild limitations" for lifting, carrying, or pushing any objects, but did not specify what those limitations might be or how much weight Plaintiff might be able to lift, carry, or push (*id.*, at 392).  Further, as to the ALJ's assessment that Plaintiff could stand, walk, or sit for six hours of an eight-hour workday, Dr. Henoch opined that Plaintiff had difficulty with prolonged sitting and standing (*id.*, at 570), and did not opine regarding Plaintiff's ability to walk for any particular length of time (*see generally id.*).  Dr. Asad, the only other doctor who gave any functional assessment regarding Plaintiff's physical abilities, did not opine on Plaintiff's ability to stand, walk, or sit.  (*Id.*, at 392.)  Regarding the ALJ's determination that Plaintiff could "occasionally climb ramps and stairs, stoop, balance, kneel, crawl, and crouch" but could never "climb ladders, ropes, or scaffolds," Dr. Henoch opined that Plaintiff was unable to lift, squat, kneel, or bend because of her pain (*id.*, at 570), while Dr. Asad opined that Plaintiff had "no limitations for bending, squatting, and kneeling" (*id.*, at 392).

As to Plaintiff's non-exertional limitations, the ALJ's determination that Plaintiff could "understand, remember, and carry out simple tasks but not at an assembly line rate," was at odds with the opinion of Dr. Knox that Plaintiff not only had "mild limitations" in following and understanding simple directions and instructions, but had "moderate-to-marked limitations" in performing simple tasks independently.  (*Id.*, at 398.)  Similarly, the ALJ's determination that

Plaintiff could make simple work-related decisions cannot be fully reconciled with Dr. Knox's opinion that Plaintiff had at least "mild limitations" in making appropriate decisions.  (*Id.*) Further, the ALJ's determination that Plaintiff could handle occasional changes in the work setting appears inconsistent with the opinion of her psychiatric treater, Dr. Ibanez, who opined that Plaintiff would be "unable to meet competitive standards" in adjusting her behavior to a work environment and setting.  (*Id.*, at 566.)  Finally, even the opinion of Dr. Lieber-Diaz, which, as noted above, was given "considerable" weight by the ALJ, did not fully support the ALJ's determination of Plaintiff's non-exertional limitations.  While Dr. Lieber-Diaz did opine that Plaintiff could understand and carry out simple tasks and make simple work-based decisions (*see id.*, at 123-24), Dr. Liber-Diaz also opined that Plaintiff was "moderately limited" in her "ability to respond appropriately to changes in the work setting" (*id.*, at 125), leaving it unclear how the ALJ determined that Plaintiff would be able to respond to such changes "occasionally."

Where there is no medical source opinion or functional assessment supporting particular limitations found by an ALJ, remand for further development of the record is appropriate.  *See, e.g., Martin v. Berryhill*, No. 16cv6184 (FPG), 2017 WL 1313837 (W.D.N.Y. Apr. 10, 2017) (finding remand warranted where the ALJ determined that Plaintiff could perform sedentary work in the absence of any medical opinion regarding Plaintiff's ability to engage in work at any exertional level).  Further, where, as here, there *are* functional assessments in the record as to many of a claimant's exertional and non-exertional limitations, it is error for the ALJ to disregard them and, instead, to substitute his own lay opinion for the opinions of the medical sources.  *See Merriman*, 2015 WL 5472934, at *18.

Whether by further development of the Record, or by further reliance on the existing opinion evidence, the ALJ should take steps, upon remand, to ensure that his RFC determination is fully supported by medical evidence.

### 3.    Failure To Consider Plaintiff's Reported Side Effects From Medication

Finally, upon remand, the ALJ should also correct his apparent failure to consider Plaintiff's subjective complaints regarding the side effects of her medications.

As set out above, an ALJ "is required to take [a] claimant's reports of pain and other limitations into account" in assessing the claimant's RFC. *Genier*, 606 F.3d at 49. If the ALJ determines that the claimant's statements of limitation are not supported by the medical record, then the ALJ's decision must also include "specific reasons for the weight given to the individual's symptoms[ ] [and] be consistent with and supported by the evidence," and those reasons must be "clearly articulated," so that a subsequent reviewer may assess how the ALJ evaluated the individual's symptoms. SSR 16-3p. Factors that are relevant to a claimant's subjective complaints of limitations include "the type, dosage, effectiveness, and side effects of any medications taken" to alleviate pain and other symptoms. *Correale-Englehart v. Astrue*, 687 F. Supp. 2d 396, 435 (S.D.N.Y. 2010); *see* 20 C.F.R. § 404.1529(c)(3).

An ALJ's failure to consider a claimant's subjective reports of her symptoms, including the side effects she experiences as a result of her medications, constitutes error. *See, e.g., Vinson v. Colvin*, No. 6:15-CV-06006 (MAT), 2015 WL 8482783, at *5 (W.D.N.Y. Dec. 9, 2015) (ALJ erred when he "failed to include in his RFC the side-effects of th[e] medications to which Plaintiff testified, chiefly, her drowsiness and tiredness, lack of ability to pay attention and concentration, difficulty remembering and increased forgetfulness"); *Caternolo v. Astrue*, No. 6:11-CV-6601 (MAT), 2013 WL 1819264, at *13 (W.D.N.Y. Apr. 29, 2013) (ALJ erred

when he "failed to consider the side effects of Plaintiff's various medications in determining her RFC").

Here, Plaintiff seems to have highlighted in her sur-reply submission (which was permitted by the Court) that her medications themselves have had a negative impact on her ability to work.  (*See* Dkt. 29 (Plaintiff stating, "I don't feel able to work especially under psychiatric medicine").)   Moreover, at the Hearing, Plaintiff repeatedly emphasized that she experienced side effects from her medication – in particular, she testified that her medications made her drowsy.  (R. at 75 ("Q: Does [the medication] help?  A: Yes, it helps, but it makes me sleepy . . . I sleep during the day and at night I don't sleep."); *see also id.*, at 78 ("Q: How many hours do you sleep during the day?  A: About four or five."); 79 ("Q: Does [tachycardia] affect your ability to do any activities? A:  Yes.  It's difficult, because I also take medication, and it also makes me sleepy."); 65 ("A: I did try to take care of a little girl . . . but I couldn't continue, because I was falling asleep with the child in my arms.").)

These subjective complaints, as related to Plaintiff's medications, were supported by at least some objective evidence in the Record, as, among Plaintiff's prescribed medications were several with known side effects of causing drowsiness or fatigue.  *See Caternolo*, 2013 WL 1819264, at *13 (relying on publicly available information from manufacturers to identify known side effects for prescribed medications).  Among the psychiatric medications that Plaintiff was taking during the relevant period, Xanax, Cymbalta, and Effexor can all reportedly cause drowsiness or tiredness, and BuSpar can apparently not only cause fatigue, but can also affect a patient's ability to sleep.[49]  In addition, certain of the medications that Plaintiff was prescribed

---

[49] *See* https://medlineplus.gov/druginfo/meds/a684001.html; https://medlineplus.gov/druginfo/meds/a604030.html; *see also*

for her physical conditions – medications such as Atenolol (a blood pressure medication) and Tizanidine (a muscle relaxant) – also have known side effects of causing tiredness or drowsiness.[50]

In his decision, however, the ALJ nowhere acknowledged Plaintiff's reported symptoms related to the side effects of her medications.  By not addressing, or even so much as acknowledging these symptoms, the ALJ failed to satisfy his obligation to take Plaintiff's subjective complaints into account, let alone the requirement that he "clearly articulate" the reasons for discounting those complaints.

Thus, upon remand, the ALJ should reassess Plaintiff's RFC, not only in the ways described above, but also by taking into account Plaintiff's subjective complaints regarding the side effects of her medications.  In addressing those complaints, the ALJ should apply the multi-factor test described above (*see* Discussion, *supra*, at Section I(E)), and, to the extent the ALJ still finds Plaintiff's complaints to be inconsistent with the Record, to set forth the reasons for his findings.

## **CONCLUSION**

For all of the foregoing reasons, Defendant's motion for judgment on the pleadings (Dkt. 23) is denied, and this case shall be remanded for further administrative proceedings, with instructions to the ALJ:

---

https://medlineplus.gov/druginfo/meds/a694020.html; https://medlineplus.gov/druginfo/meds/a688005.html.

[50] *See* https://medlineplus.gov/druginfo/meds/a684031.html; *see also* https://medlineplus.gov/druginfo/meds/a601121.html.

(1) to take steps to develop the Record by (a) seeking to obtain the records of Dr. Vinita Patel, the rheumatologist who seemingly diagnosed Plaintiff with rheumatoid arthritis, and (b) seeking clarification as to the bases of Dr. Avraham Henoch's diagnosis of fibromyalgia;

(2) to reassess, in light of the developed Record, whether Plaintiff had the medically determinable impairments of rheumatic fever, rheumatoid arthritis, and/or fibromyalgia, and, if so, to evaluate the severity of such impairment(s);

(3) to reweigh the medical opinion evidence in accordance with the treating physician rule;

(4) to reassess Plaintiff's RFC to ensure that each functional assessment is supported by medical evidence, as opposed to the ALJ's lay opinion; and

(5) to consider Plaintiff's reported side effects of her medication.

If Plaintiff does not have access to the cases cited herein that are reported only on Westlaw, she may request copies from Defendant's counsel. *See* Local Civ. R. 7.2 ("Upon request, counsel shall provide the *pro se* litigant with copies of [cases and other authorities that are unpublished or reported exclusively on computerized databases that are] cited in a decision of the Court and were not previously cited by any party").

In light of this Order, the Clerk of Court is directed to close Dkt. 23 on the Docket of this action, and to enter judgment in Plaintiff's favor, directing remand. The Clerk of Court is also directed to mail a copy of this Memorandum and Order to Plaintiff, at the address reflected on the Docket and shown below.

Dated: New York, New York
March 29, 2021

SO ORDERED

[signature]

DEBRA FREEMAN
United States Magistrate Judge

Copies to:

Ms. Kennia Y. Garces
219 Miriam Street
Apt. BD
Bronx, NY 10458

Defendant's counsel (via ECF)